**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ETON PARK FUND, L.P. and ETON PARK MASTER FUND, LTD., | Civil Action No. 1:16-cv-09393-AKH |
| Plaintiffs, | **AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| AMERICAN REALTY CAPITAL PROPERTIES, INC. (n/k/a VEREIT, INC.), ARC PROPERTIES OPERATING PARTNERSHIP L.P. (n/k/a VEREIT OPERATING PARTNERSHIP, L.P.), AR CAPITAL LLC, NICHOLAS S. SCHORSCH, DAVID S. KAY, BRIAN S. BLOCK, LISA P. MCALISTER, LISA BEESON, EDWARD M. WEIL, PETER M. BUDKO, BRIAN D. JONES, WILLIAM M. KAHANE, LESLIE D. MICHELSON, WILLIAM G. STANLEY, EDWARD G. RENDELL, SCOTT J. BOWMAN, THOMAS A. ANDRUSKEVICH, and SCOTT P. SEALY, SR., | |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.     JURISDICTION AND VENUE ................................................................................. 1

II.    PARTIES ................................................................................................................... 2

    A.     Plaintiffs ....................................................................................................... 2

    B.     Defendants .................................................................................................... 3

        1.     American Realty Corporate Defendants .......................................... 3

        2.     American Realty Executive Defendants ........................................... 4

        3.     American Realty Management Defendants ........................................ 6

        4.     American Realty Director Defendants ............................................. 9

III.   SECURITIES ACT CLAIMS .................................................................................. 10

    A.     American Realty's False And Misleading Securities Offerings ................... 10

    B.     Counts ......................................................................................................... 17

    COUNT I  Violation Of Section 11 Of The 1933 Act In Connection With
    The Cole Merger ..................................................................................................... 18

    COUNT II  Violation Of Section 11 Of The 1933 Act In Connection With
    The May 2014 Offering Of American Realty Stock .............................................. 20

    COUNT III  Violation Of Section 15 Of The 1933 Act ......................................... 21

IV.   EXCHANGE ACT AND COMMON LAW CLAIMS ............................................. 22

    A.     Overview Of The Fraud .............................................................................. 22

        1.     Defendant Schorsch's REIT Empire .............................................. 22

        2.     The Significance And Importance Of "Adjusted Funds
              From Operations" ........................................................................... 25

        3.     American Realty's Campaign To Rapidly Grow Through
              Mergers And Acquisitions .............................................................. 28

        4.     American Realty's Acquisition Binge Was Highly
              Profitable For Defendant Schorsch's Empire And American
              Realty's Executives ........................................................................ 31

        5.     Unknown To Investors At The Time, American Realty
              Intentionally Misstates The Company's AFFO ............................. 33

6.      American Realty's Audit Committee Discloses That Certain Of Its Top Officers Intentionally Misrepresented The Company's AFFO ................................................... 36

7.      Defendants Schorsch, Kay And Beeson Unexpectedly "Resign" ............................................................................. 39

8.      American Realty Confirms That It Falsified Four Years Of Financials And Suffered Material Weaknesses Over Internal Controls ................................................................. 40

B.      Additional Allegations Of Scienter ................................................... 48

C.      Materially False And Misleading Statements ................................... 52

        1.      False And Misleading Statements Before Plaintiffs' Purchases In The Relevant Period ........................................... 53

        2.      False And Misleading Statements During The Relevant Period .......................................................................... 56

                a)      Cole Merger Announcement And Press Release ............................. 56

                b)      Third Quarter 2013 Financial Results .............................. 58

                c)      ARCT IV Merger Proxy Materials ................................... 59

                d)      December 2013 Debt Offerings ..................................... 61

                e)      Cole Merger Proxy Materials ...................................... 61

                f)      Fourth Quarter And Year-End 2013 Financial Results .................... 63

                g)      First Quarter 2014 Financial Results ............................... 67

                h)      May 2014 Secondary Stock Offering ................................ 70

                i)      Second Quarter 2014 Financial Results ............................. 72

D.      No Safe Harbor ........................................................................ 76

E.      Plaintiffs' Exchange Act Claims Are Timely ...................................... 77

F.      Plaintiffs' Reliance ..................................................................... 79

G.      Loss Causation ........................................................................ 83

H.      Counts ................................................................................. 86

COUNT IV  Violation Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder .................................................. 86

COUNT V  Violation Of Section 20(a) Of The Exchange Act ........................................ 87

COUNT VI  New York Common Law Fraud ................................................................ 89

V.      PRAYER FOR RELIEF ................................................................................................. 90

VI.     JURY TRIAL DEMAND ............................................................................................... 91

This action is brought by Eton Park Fund, L.P. and Eton Park Master Fund, Ltd. (collectively, "Plaintiffs") under the Securities Act of 1933 ("Securities Act" or "1933 Act"), the Securities Exchange Act of 1934 ("Exchange Act") and New York law to recover damages for losses Plaintiffs suffered in connection with their purchases and acquisitions of the common stock of American Realty Capital Properties, Inc. ("American Realty" or the "Company") (n/k/a VEREIT, Inc.) and security-based swap agreements ("American Realty Swaps" or "Swaps") representing shares of American Realty common stock, on or about February 7, 2014 and May 21, 2014, in connection with the Cole Merger and May 2014 Equity Offering (as defined below). Plaintiffs allege the following upon personal knowledge as to their own acts and upon information and belief as to all other matters. Their information and belief are based on, among other things, the investigation conducted by their counsel.

## I.    <u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, and 15 U.S.C. § 78aa, 28 U.S.C. § 1331.

2.    The Court has supplemental jurisdiction over the state law claims asserted pursuant to 28 U.S.C. § 1367(a).

3.    Venue is properly laid in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391. The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

4.    In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange, namely, the NASDAQ stock market ("NASDAQ").

## II.  **PARTIES**

### A.  **Plaintiffs**

5.  Plaintiffs Eton Park Fund, L.P., a Delaware limited partnership ("Eton Park Domestic Fund"), and Eton Park Master Fund, Ltd., an exempted company incorporated with limited liability in the Cayman Islands ("Eton Park Overseas Fund"), are investment funds advised by Eton Park Capital Management, L.P. ("Eton Park").  Eton Park is a global investment firm registered with the U.S. Securities and Exchange Commission ("SEC") as an investment adviser, with its principal offices at 399 Park Avenue, 10th Floor, New York, New York 10022.

6.  During the Relevant Period (which, as used herein, refers to the period of October 22, 2013 through October 29, 2014), Plaintiffs purchased or acquired American Realty common stock and/or Swaps, and were damaged thereby.  Plaintiffs purchased or acquired 11,464,780 shares of American Realty common stock during the Relevant Period, including: (i) 4,000,000 shares purchased in the Company's common stock offering on May 21, 2014 (the "May 2014 Equity Offering") at a price of $12.00 per share; and (ii) 7,464,780 shares acquired on February 7, 2014, in exchange for shares of common stock of Cole Real Estate Investments, Inc. ("Cole, Inc.") pursuant to the terms of the Cole Merger Agreement.  Under the Cole Merger Agreement, shareholders of Cole, Inc., including Plaintiffs, received 1.0929 shares of American Realty stock for each share of Cole, Inc., which American Realty shares were valued at $13.99 per share upon the close of market trading on February 7, 2014.  Also in connection with the closing of the Cole, Inc. merger on February 7, 2014, Plaintiff Eton Park Overseas Fund acquired American Realty Swaps representing 13,863,165 shares of American Realty common stock, in exchange for its holdings of Cole, Inc. stock swaps.  Plaintiff Eton Park Overseas Fund's American Realty Swaps were economically equivalent to the purchase of shares of American Realty common stock. The Swaps economically replicated physical trading and ownership of the Company's common stock,

and the prices of American Realty Swaps were pegged to the market prices of the referenced American Realty shares.

**B.    Defendants**

**1.    American Realty Corporate Defendants**

7.       Defendant American Realty is a Maryland corporation, headquartered at 405 Park Avenue, 15th Floor, New York, New York 10022, and qualifies as a real-estate investment trust ("REIT") for federal income tax purposes. On July 28, 2015, American Realty changed its name to VEREIT, Inc.  American Realty's common stock began trading on NASDAQ under the symbol "ARCP" on September 7, 2011. On February 28, 2013, American Realty common stock was transferred to the NASDAQ Global Select Market, or the NASDAQ.  American Realty owns and acquires freestanding commercial real-estate leased on a medium-term basis pursuant to triple net leases.  American Realty is a subsidiary of AR Capital, which is a subsidiary of RCS Capital, the parent company of the Schorsch real-estate investment group. Substantially all of American Realty's business is conducted through its operating partnership, ARC Properties (defined immediately below), of which American Realty is the sole general partner.

8.       Defendant ARC Properties Operating Partnership L.P. ("ARC Properties" or "Operating Partnership") (n/k/a VEREIT Operating Partnership, L.P.") is a subsidiary, and the operating partnership, of American Realty.  American Realty is ARC Properties' sole general partner, an entity formed on January 13, 2011, to conduct the primary business of acquiring, owning and operating single tenant, freestanding commercial real-estate properties. ARC Properties is the entity through which substantially all of American Realty's operations are conducted.  As of June 30, 2014, American Realty owned 97.3% of the common equity interests in ARC Properties.  According to American Realty's financial statements, American Realty together with ARC Properties is known as the Company, rendering American Realty and ARC

Properties indistinguishable. ARC Properties is a Delaware limited partnership, located at 405 Park Avenue, 15th Floor, New York, New York 10022.

9. Defendant AR Capital LLC ("AR Capital") is a limited-liability company that purported to provide management and advisory services to American Realty and its affiliates. AR Capital is a subsidiary of RCS Capital and is directly or indirectly owned and controlled by Defendants Schorsch and William M. Kahane.

10. Defendants American Realty, ARC Properties, and AR Capital are collectively referred to herein as the "American Realty Corporate Defendants."

## 2. American Realty Executive Defendants

11. Defendant Nicholas S. Schorsch ("Schorsch") founded American Realty in 2010 and was its Chief Executive Officer ("CEO") and Chairman during the Relevant Period. Defendant Schorsch "resigned" as CEO on October 1, 2014, but remained Chairman until December 15, 2014, when he "stepped down" from the Company's Board of Directors following American Realty's October 29, 2014 disclosures. During the Relevant Period, Defendant Schorsch also was an officer and/or director at more than 40 American Realty-related entities. Schorsch was the Chairman/CEO of ARC Advisors during the Relevant Period; the CEO/Chairman and a beneficial owner of RCS Capital; the CEO/Chairman and a beneficial owner of AR Capital; and the Chairman and a beneficial owner of RCAP Capital Corporation ("RCAP"), an investment firm affiliated with certain American Realty Corporate Defendants, from its formation in February 2013 until the end of the Relevant Period.[1] Throughout the Relevant Period, Schorsch acted and/or

---

[1] RCAP is an investment firm with operating subsidiaries including retail advice services, wholesale distribution, investment banking, capital markets, investment research, investment management and crowdfunding. RCAP was originally formed as a holding company that would operate and grow several RCS Capital subsidiaries, including Realty Capital Securities, LLC, a wholesale broker-dealer business, and RCS Advisory Services, LLC, an investment banking and transaction management services provider. During the Relevant Period, RCAP was externally managed by RCS Capital Management, LLC, an entity

made the statements detailed herein in his capacity as an officer, member, beneficial owner or director of American Realty, AR Capital, RCAP, RCS Capital, ARC Properties, ARC Advisors, ARCT III, and ARCT IV, as well as the other entities in which he held ownership, executive and/or director positions.  Schorsch signed every Form 10-K, Form 10-Q and offering document American Realty filed with the SEC during the Relevant Period.

12.     Defendant Brian S. Block ("Block") was American Realty's Chief Financial Officer ("CFO") and Executive Vice President beginning in December 2010, as well as its Treasurer and Secretary beginning in January 2014.  On October 28, 2014, Defendant Block "resigned" from the Company.  During the Relevant Period, Defendant Block reviewed, approved, and signed American Realty's false and misleading SEC filings, including the First Quarter 2013 Form 10-Q, the Second Quarter 2013 Form 10-Q, the Third Quarter 2013 Form 10-Q, the 2013 Form 10-K, the First Quarter 2014 Form 10-Q, the Second Quarter 2014 Form 10-Q, and signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX Certifications").  Defendant Block reviewed, approved and signed the Cole Merger Proxy and the Shelf Registration Statement.  Defendant Block also participated in conference calls with securities analysts, during which American Realty's false and misleading filings with the SEC and its press releases were presented and discussed, including on May 6, 2013, August 6, 2013, November 7, 2013, February 27, 2014, May 8, 2014, and July 29, 2014.

13.     Defendant David S. Kay ("Kay") was American Realty's President from December 2013 until October 1, 2014, after which he replaced Defendant Schorsch as the Company's CEO and joined the Company's Board of Directors.  On December 15, 2014, American Realty

---

directly or indirectly controlled by Schorsch and Kahane, its co-CEOs. During the Relevant Period, Schorsch, Weil, Kahane, Block, Budko, and Jones held executive officer and/or director positions at RCAP. During the Relevant Period, Schorsch and Kahane controlled more than 95% of the voting rights of RCAP through their ownership of RCS Capital, RCAP's parent and controlling shareholder.

announced that Defendant Kay had "stepped down" as the Company's CEO and as a member of its Board of Directors. Kay signed American Realty's 2013 Form 10-K and the Cole Merger Registration Statement. Between December 2013 and the end of the Relevant Period, Kay acted and/or made the statements detailed herein in his capacity as an officer, and director of American Realty.

14.     Defendant Lisa P. McAlister ("McAlister") was American Realty's Senior Vice President and Chief Accounting Officer ("CAO") from November 4, 2013 through October 28, 2014, when she was terminated. McAlister signed American Realty's 2013 Form 10-K, Form 10-Q for the second quarter of 2014 and the registration statement for the September 2014 Senior Notes. During the Relevant Period, McAlister acted and/or made the statements detailed herein in her capacity as an officer of American Realty. McAlister is a licensed Certified Public Accountant ("CPA").

15.     Defendant Lisa Beeson ("Beeson") was American Realty's Chief Operating Officer ("COO") beginning on November 4, 2013, as well as its President beginning October 1, 2014. On December 15, 2014, American Realty announced that she had "stepped down" from both positions. Beeson signed American Realty's Form 10-K for 2013, as well as the registration statements for the ARCT IV and Cole Mergers. During the Relevant Period, Beeson acted and/or made the statements detailed herein in her capacity as an officer of American Realty. Defendants Schorsch, Block, Kay, McAlister, and Beeson are collectively referred to herein as the "American Realty Executive Defendants" or "Executive Defendants."

### 3.     American Realty Management Defendants

16.     Defendant Edward M. Weil ("Weil") served as American Realty's President, Treasurer, Secretary and a Director from its formation until January 2014. Weil remained a member of American Realty's Board of Directors through June 2014, when he "resigned" to

purportedly "enhance corporate governance." Weil also served as President, COO, Treasurer, Secretary and Director of ARCT III and ARCT IV from their formation until their mergers with American Realty. Weil is currently President and COO at AR Capital under the name "Michael Weil" and a beneficial owner of AR Capital. Weil was the Executive Vice President of ARC Advisors from November 2010 until at least January 2014. He previously served as CEO of RCAP from its formation until November 2015, and currently remains a director of RCAP. Prior to being appointed CEO of RCAP, Weil was RCAP's President, Treasurer, Secretary and a Director. Weil was the Executive Vice President of RCS Capital (aka RCAP Holdings, Inc.) from its formation until February 2012 and was a beneficial owner of RCS Capital throughout the Relevant Period. During the Relevant Period, Weil served and/or continues to serve as an officer and/or director at more than a dozen American Realty-related entities, including Business Development Corporation of America (Executive Vice President and Secretary). Weil signed American Realty's 2011 and 2012 Forms 10-K; American Realty's 2012 and 2013 Shelf Registration Statements used for the July 2013 Offering, the December 2013 Offerings and the May 2014 Offering; the ARCT IV and the Cole Merger Registration Statements; and permitted the use of his name to solicit proxies for the ARCT III, ARCT IV and Cole Mergers. Throughout the Relevant Period, Weil took the actions and/or made the statements detailed herein in his capacity as an officer, member and director of American Realty, AR Capital, ARC Advisors, RCAP, ARCT III and ARCT IV.

17. Peter M. Budko ("Budko") was American Realty's Executive Vice President and Chief Investment Officer ("CIO") from December 2010 until January 8, 2014. During the Relevant Period, Budko served and/or continues to serve as an officer and/or director at numerous American Realty-related entities, including: AR Capital (CIO and Executive Vice President from December 2012 until the end of the Relevant Period and a beneficial owner of that entity); RCAP

(Director from February 2013 until December 2014 and CIO/Executive Vice President from February 2013 until August 2015); ARC Advisors (CIO and Executive Vice President from November 2010 until at least January 2014); RCS Capital, aka RCAP Holdings (CIO/Executive Vice President; from its formation; Budko is also a beneficial owner of that entity); and Business Development Corporation of America (President and CEO). Budko signed the Registration Statements, which incorporated the false financial statements, for the ARCT IV and Cole Mergers and permitted American Realty to use his name to solicit proxies for those mergers. Throughout the Relevant Period, Budko acted and/or made the statements detailed herein in his capacity as an officer, member and/or director of American Realty, AR Capital, RCAP, ARC Advisors, ARCT III and/or ARCT IV, as well as the other American Realty-related entities in which he held ownership, executive and/or director positions.

18.     Brian D. Jones ("Jones") was American Realty's COO from February 2013 until November 2013 and has been the Company's CFO since December 2013. Jones signed the Shelf Registration Statement. Since December 2013, Jones has been the CFO, Assistant Secretary and Manager of RCAP. Jones also has served as head of the investment banking division of Realty Capital Securities since February 2013. Jones was a Senior Vice President, Managing Director and Head of Investment Banking at Realty Capital Securities from December 2010 until February 2012. Jones then moved to ARCT in March 2012 as CFO and Treasurer until February 2013. Jones signed American Realty's 2013 Shelf Registration Statement used for the July 2013, December 2013 and May 2014 Offerings, as well as the registration statements for the ARCT IV and Cole Mergers. Throughout the Relevant Period, Jones acted and/or made the statements detailed herein in his capacity as an officer, member and/or director of American Realty and RCAP, as well as the

other American Realty-related entities listed above in which he held ownership, executive and/or director positions. Jones is a licensed CPA.

19.     Defendants Weil, Budko and Jones are collectively referred to herein as the "American Realty Management Defendants" or "Management Defendants."

### 4.     American Realty Director Defendants

20.     Defendant William M. Kahane ("Kahane") was a member of American Realty's Board of Directors from February 2013 until June 24, 2014.

21.     Defendant Leslie D. Michelson ("Michelson") was a member of American Realty's Board of Directors during the Relevant Period.

22.     Defendant William G. Stanley ("Stanley") was a director of ARCT IV prior to the January 2014 merger with American Realty. Following the merger, Stanley became an American Realty director, and remained one through the end of the Relevant Period.

23.     Defendant Edward G. Rendell ("Rendell") was a member of American Realty's Board of Directors throughout the Relevant Period.

24.     Defendant Scott J. Bowman ("Bowman") was a member of American Realty's Board of Directors during the Relevant Period until September 9, 2014.

25.     Defendant Thomas A. Andruskevich ("Andruskevich") was a member of Cole, Inc.'s Board of Directors and, upon the completion of the Cole Merger in February 2014, became a member of American Realty's Board of Directors.

26.     Defendant Scott P. Sealy, Sr. ("Sealy") was a member of Cole, Inc.'s Board of Directors and, upon the completion of the Cole Merger in February 2014, became a member of American Realty's Board of Directors. Sealy resigned effective June 10, 2014.

27.     Defendants Kahane, Michelson, Stanley, Rendell, Bowman, Andruskevich and Sealy are collectively referred to herein as the "American Realty Director Defendants" or "Director

Defendants." During the Relevant Period, Michelson, Stanley, Rendell, Bowman, Andruskevich and Sealy reviewed, approved, and signed American Realty's false and misleading 2013 Form 10-K, and Michelson and Rendell reviewed, approved, and signed American Realty's false and misleading 2012 Form 10-K. During the Relevant Period, Defendants Kahane, Rendell, Michelson and Bowman signed American Realty's false and misleading 2013 Shelf Registration Statement.

## III.   SECURITIES ACT CLAIMS

28.     In this Section of the Complaint, Plaintiffs assert strict liability and negligence claims based on violations of the Securities Act. Plaintiffs' Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of the Securities Act Defendants and do not sound in fraud.

### A.     American Realty's False And Misleading Securities Offerings

29.     Since the Company went public in September 2011, it completed at least seven offerings of debt and equity securities, raising over $3.5 billion in cash and funding multiple acquisitions. Among these securities offerings are the two offerings identified in the table below (the "Offerings") in which American Realty issued the securities that form the basis of Plaintiffs' Securities Act claims herein:

| DATE OF OFFERING | SECURITY DESCRIPTION | SIZE OF OFFERING |
|---|---|---|
| Offering Pursuant to the 2013 Shelf Registration Statement | | |
| May 2014 | American Realty stock issued in the May 2014 Offering (CUSIP 02917T104) | 138 million shares |
| Offering Pursuant to the December 23, 2013 Registration Statement | | |
| February 2014 | American Realty stock issued in Cole Merger (CUSIP 02917T104) | 520.8 million shares |

30.     In the offering materials for each of these Offerings (the "Offering Materials"), American Realty incorporated by reference the contents of the following SEC filings, which are discussed in further detail in ¶¶34-39 below:

| Security | Offering Date | Incorporated Documents |
|---|---|---|
| American Realty common stock issued in connection with May 2014 Offering | May 2014 | <ul><li>2012 Form 10-K</li><li>2013 Form 10-K</li><li>1Q14 Form 10-Q</li></ul> |
| American Realty stock issued in connection with Cole Merger | February 2014 | <ul><li>2012 Form 10-K</li><li>1Q13 Form 10-Q</li><li>2Q13 Form 10-Q</li><li>3Q13 Form 10-Q</li></ul> |

31.     The Offering Materials, including the materials incorporated by reference, contained, among other things: (a) certain U.S. Generally Accepted Accounting Principles ("GAAP") financial statements previously filed with the SEC; and (b) American Realty's adjusted funds from operations, or "AFFO."  AFFO is a measure of operating performance that is generally equal to a REIT's funds from operations ("FFO") with adjustments made for recurring capital expenditures used to maintain the quality of the REIT's underlying assets.  AFFO is crucial to analysts and investors in valuing a REIT.  As American Realty stated in its 2013 Amended Form 10-K, the Company's "[s]enior management considered AFFO to be an important metric used by analysts and investors in evaluating the Company's performance."

32.     The Offering Materials further contained a representation that the internal controls of American Realty were effective, as well as that all material changes to American Realty's internal controls over financial reporting were disclosed.

33.     As alleged herein, the financial information incorporated into the Offering Materials and internal control-related representations, contained untrue statements of material fact

and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. American Realty violated GAAP standards and SEC rules because, as the Company has admitted, the financial information contained in American Realty's financial statements was not prepared in conformity with GAAP and SEC requirements, and the financial information did not provide a fair presentation of the Company's operations. American Realty understated its operating expenses and its operating and net losses, as well as misclassified expenses to give the false impression to investors that those expenses were non-recurring.

**2012 Annual Report**

34. American Realty filed with the SEC on February 28, 2013 its Annual Report on Form 10-K for the period ending December 31, 2012 (the "2012 Form 10-K"). Schorsch and Block each prepared, reviewed and signed the 2012 Form 10-K. American Realty's purported financial results were included in the 2012 Form 10-K, including its purported AFFO. The 2012 Form 10-K further represented that the included financial statements were accurate and presented in accordance with GAAP, as well as that American Realty's internal controls were effective and that there had purportedly been disclosure of any material changes to its internal controls over financial reporting.

35. SOX Certifications signed by Schorsch and Block were also contained in the 2012 Form 10-K. These SOX Certifications purported to confirm that the financial information contained in the 2012 Form 10-K filing was accurate and did not omit material facts. The SOX Certifications signed by Schorsch and Block contained further representations American Realty's internal and disclosure controls were effective stating, in pertinent part:

I, [Schorsch and Block], certify that:

1. I have reviewed this . . . Report . . . of [ARCP];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures . . .;

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

36. The 2012 Form 10-K, itself, contained the following additional representation that:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this . . . [report] and determined that the disclosure controls and procedures are effective . . . .

**2013 Annual and Quarterly Reports**

37. American Realty filed with the SEC on May 6, 2013 its Quarterly Report on Form 10-Q for the period ending March 31, 2013 (the "1Q13 Form 10-Q"). American Realty filed with the SEC on August 6, 2013 its Quarterly Report on Form 10-Q for the period ending June 30, 2013 (the "2Q13 Form 10-Q"). American Realty filed with the SEC on November 7, 2013, its Quarterly Report on Form 10-Q for the period ending September 30, 2013 (the "3Q13 Form 10-Q"). Each of the 2013 Forms 10-Q presented American Realty's purported financial results, including its purported AFFO. They further represented that the included financial statements were accurate and presented in accordance with GAAP as well as that American Realty's internal controls were effective and that there had purportedly been disclosure of any material changes to its internal controls over financial reporting. The 2013 Forms 10-Q each also included SOX Certifications signed by Schorsch and Block, which in all material respects are identical to the one quoted above.

38. American Realty filed with the SEC on February 27, 2014, its Annual Report on Form 10-K for the period ending December 31, 2013 (the "2013 Form 10-K"). The 2013 Form

10-K presented American Realty's purported financial results, including its purported AFFO. The 2013 Form 10-K further represented that the included financial statements were accurate and presented in accordance with GAAP, as well as that American Realty's internal controls were effective and that there had purportedly been disclosure of any material changes to its internal controls over financial reporting. The 2013 Form 10-K also included SOX Certifications signed by Schorsch and Block, which in all material respects are identical to the one quoted above.

**2014 Forms 10-Q**

39. American Realty filed with the SEC on May 8, 2014, its Quarterly Report on Form 10-Q for the period ending March 31, 2014 (the "1Q14 Form 10-Q"). American Realty filed with the SEC on July 29, 2014, its Quarterly Report on Form 10-Q for the period ending June 30, 2014 (the "2Q14 Form 10-Q"). The 2014 Forms 10-Q provided American Realty's purported financial results, including its purported AFFO. They further represented that the included financial statements were accurate and presented in accordance with GAAP, as well as that American Realty's internal controls were effective and that there had purportedly been disclosure of any material changes to its internal controls. They each also included SOX Certifications signed by Schorsch and Block, which in all material respects are identical to the one quoted above.

**Reasons Why The Incorporated Information Was Materially False And Misleading**

40. American Realty filed on March 2, 2015, its restated financial results for fiscal year 2012, fiscal year 2013, and the first two quarters of 2014 (the "Restatement"). Through the Restatement, American Realty admitted that the financial results reported in American Realty's 2012, 2013 and quarterly 2014 filings with the SEC were false and misleading when made, as well as that the financial information they contained did not fairly and accurately present the Company's financial performance. The undisclosed facts were as follows:

- American Realty improperly and repeatedly misclassified ordinary business expenses as "merger-related." In doing so, American Realty inflated AFFO and gave investors the false impression that such expenses were not recurring in nature.

- American Realty did not recognize the impairment of its properties as an expense. In so doing, American Realty inflated AFFO and understated expenses.

- American Realty did not recognize stock granted to its directors as an expense. In so doing, American Realty understated expenses and net losses.

- American Realty improperly and repeatedly misclassified management fees paid to American Realty-related entities as being merger and other non-routine transaction-related. In so doing, American Realty disguised its transactions with related parties, artificially inflated AFFO, and misled investors that such expenses were not recurring in nature.

- American Realty improperly and repeatedly misrecorded payments made to Schorsch-controlled entities as for the purchase of equipment and furniture that lacked evidence of receipt. In so doing, American Realty overstated its assets and understated expenses and net losses.

- American Realty improperly and repeatedly misrecorded expenses in the incorrect accounting period. In so doing, American Realty understated net losses and reported expenses.

41. As a result of American Realty's accounting improprieties and misstatements during the Relevant Period, the Company's net loss attributable to stockholders was understated by up to 26%, and its operating loss was understated by up to 15%.

42. American Realty's accounting improprieties and misstatements also resulted in the material overstatement of the Company's reported AFFO throughout the Relevant Period, as set forth below:

| AFFO Per Share Misstatements | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | FY11 | FY12 | 1Q13 | 2Q13 | 3Q13 | 4Q13 | FY13 | 1Q14 | 2Q14 |
| Reported AFFO per share | $ 0.60 | $ 0.47 | $ 0.20 | $ 0.19 | $ 0.30 | $ 0.38 | $ 1.07 | $ 0.26 | $ 0.24 |
| Restated AFFO per share | $ 0.56 | $ 0.46 | $ 0.10 | $ 0.18 | $ 0.28 | $ 0.29 | $ 0.87 | $ 0.19 | $ 0.21 |
| % Overstatement | 7.1% | 2.2% | 100.0% | 5.6% | 7.1% | 31.0% | 23.0% | 36.8% | 14.3% |

43. The American Realty filings with the SEC listed above in ¶¶34-39, were also materially false and misleading because they contained representations about the Company's

internal controls that left out and misstated material facts, including the SOX Certifications signed by Schorsch and Block. The undisclosed true facts were that American Realty's internal controls were deficient and inadequate and allowed for the misstatements of American Realty's financial results and overstatement of AFFO. The undisclosed control deficiencies also included a lack of controls to preclude the Company from misreporting its financials, as well as a lack of controls over the calculation of AFFO and the assessment of the Company to meet the AFFO guidance that it provided to investors.

**Defendants' Failure To Exercise Due Diligence And**
**Plaintiffs' Lack Of Knowledge Of The Misstatements And Omissions**

44.     The Defendants against whom a Section 11 claim is asserted failed to conduct the required reasonable and diligent investigation of the statements in the Offering Materials. If they had done so, they would have known of the material misstatements and omissions in the Offering Materials, including the misstatements and omissions regarding AFFO and American Realty's internal controls.

45.     At the time of their acquisition of the securities issued in each of the Offerings, Plaintiffs were not aware of the untrue and misleading statements and omissions alleged herein and could not have reasonably discovered such untruths or omissions.

**B.      Counts**

46.     In each of the Offerings alleged in Counts I to III below, Plaintiffs acquired securities traceable to the 2013 Shelf Registration Statement or the December 23, 2013 Registration Statement. As a direct and proximate result of misrepresentations and/or omissions therein, Plaintiffs suffered substantial damage in connection with their acquisition of such securities. As a result of the conduct herein alleged, each Defendant named in Counts I to III violated Section 11 of the 1933 Act.

47.     At the time of their acquisition of the securities issued in each of the Offerings, Plaintiffs were not aware of the untrue or misleading nature of the statements and/or the omissions alleged herein and could not have reasonably discovered such untruths or omissions before October 29, 2014.

48.     Plaintiffs' claims are timely.   The claims asserted herein under the Securities Act were first brought in the American Realty consolidated securities class action captioned, *In re American Realty Capital Properties, Inc. Litigation*, No. 15-mc-00040-AKH (S.D.N.Y.) (the "Class Action"), within applicable limitations periods.   The filing of the initial class action complaint in the Class Action asserting such Securities Act claims served to toll the statute of limitations for all individual claims of putative class members under the *American Pipe* tolling doctrine.   *See American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).   Plaintiffs were members of the putative class in such case (and related putative class action cases) until the filing of this action and thus benefit from the *American Pipe* tolling doctrine.   Plaintiffs' Securities Act claims are also brought within applicable repose periods.   Less than three years elapsed between the time that the securities upon which the claims in this Complaint are based were offered to the public and the date the action commenced.

**COUNT I**

**Violation Of Section 11 Of The 1933 Act**
**In Connection With The Cole Merger**

49.     Plaintiffs incorporate the allegations above as if fully set forth herein.   With respect to this Count, Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

50.     On or about October 22, 2013, American Realty and Cole, Inc. entered into an Agreement and Plan of Merger (the "Cole Merger Agreement").   The merger agreement (the "Cole

Merger") provided that Cole, Inc. shareholders would receive 1.0929 shares of American Realty stock or a cash payment for each share of Cole, Inc.

51.     The Cole Merger was consummated pursuant to a Registration Statement on Form S-4 filed with the SEC on December 23, 2013 (the "December 23, 2013 Registration Statement"), and a Joint Proxy Statement/Prospectus dated December 23, 2013 that "forms a part" of the registration statement (collectively, the "Cole Merger Materials"). 520.8 million shares of American Realty common stock were issued in the Cole Merger.

52.     The Cole Merger Materials incorporated by reference the 2012 Form 10-K and the 1Q13, 2Q13 and 3Q13 Form 10-Qs. These filings included financial information including statements regarding AFFO, and the representations concerning American Realty's internal controls described above at ¶¶34-37.

53.     For all the reasons set forth in ¶¶40-43, the Cole Merger Materials were false and misleading in that they contained false statements of material facts and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not false or misleading.

54.     Plaintiffs acquired American Realty common stock in the Cole Merger traceable to the December 23, 2013 Registration Statement, and bring this claim pursuant to Section 11 of the 1933 Act against:

| DEFENDANT | | SECTION 11 LIABILITY |
|---|---|---|
| **Registrant** | American Realty | As registrant, strictly liable for misstatements and omissions in Cole Merger Materials and statements incorporated therein. |
| **Individual Defendants** | Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block and Beeson | Each signed and/or authorized the signing of the December 23, 2013 Registration Statement, which includes the information incorporated therein by reference, as alleged in ¶¶29-30, above. |

## COUNT II

### Violation Of Section 11 Of The 1933 Act In
### <u>Connection With The May 2014 Offering Of American Realty Stock</u>

55.     Plaintiffs incorporate the allegations above as if fully set forth herein.  With respect to this Count, Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

56.     On May 21, 2014, American Realty entered into an agreement related to the sale of 138 million shares of American Realty common stock at $12 per share.  The May 2014 Equity Offering, which raised $1.65 billion from investors, was conducted pursuant to the 2013 Shelf Registration Statement, as well as a May 21, 2014 preliminary Prospectus Supplement, and a May 23, 2014 Prospectus Supplement, both of which formed a part of the 2013 Shelf Registration Statement (together, the "May 2014 Equity Offering Materials").

57.     The May 2014 Equity Offering Materials incorporated by reference the 2012 Form 10-K, the 2013 Form 10-K and the 1Q14 Form 10-Q.  These filings included financial information, including statements regarding AFFO, and representations concerning American Realty's internal controls.  The Forms 10-Q included statements regarding AFFO that were not expressly set forth in the 2013 Shelf Registration Statement (and were materially overstated, as set forth in ¶42).

58.     For all the reasons set forth in ¶¶40-43, the May 2014 Equity Offering Materials were false and misleading in that they contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not false or misleading.

59.     Plaintiffs acquired American Realty common stock in the May 2014 Equity Offering traceable to the 2013 Shelf Registration Statement, and bring this claim pursuant to Section 11 of the 1933 Act against:

| DEFENDANT | | SECTION 11 LIABILITY |
|---|---|---|
| **Registrant** | American Realty | As registrant, strictly liable for misstatements and omissions in the May 2014 Equity Offering Materials and statements incorporated therein. |
| **Individual Defendants** | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman, Stanley, Andruskevich and Sealy | Each signed and/or authorized the signing of the 2013 Shelf Registration Statement, which includes the information incorporated therein by reference, as alleged in ¶¶29-30, above, or was a director of American Realty at the time of the filing of the part of the Registration Statement with respect to which his or her liability is asserted. |

## COUNT III

### Violation Of Section 15 Of The 1933 Act

60.     This claim is brought against Defendant AR Capital for its control of Defendant American Realty in connection with American Realty's violation of Section 11 of the 1933 Act relating to:

| Registration Statement | Date |
|---|---|
| 520.8 million shares of American Realty stock issued in Cole Merger | 2/2014 |
| 138 million shares of American Realty stock issued in May 2014 | 5/2014 |

**Control of American Realty**

61.     AR Capital possessed the power to control, and did control, directly and/or indirectly, the actions of American Realty during the Relevant Period. AR Capital is wholly owned by Schorsch, Kahane, Weil, Budko, and Block.[2] From December 27, 2012 until the end of the Relevant Period, AR Capital owned and possessed the power to control, and did control, directly and/or indirectly, the actions of ARC Advisors, which was the external manager of American Realty and exerted day-to-day control over American Realty's affairs. The resources of AR Capital

---

[2] Plaintiffs do not assert Section 15 claims against Defendants Schorsch, Kahane, Weil, Budko, or Block.

played a pivotal role in American Realty's business and growth strategies, including American Realty's numerous acquisitions. American Realty itself has acknowledged that AR Capital (as one of ARC Advisors' parent companies) have "the power to direct the activities of [ARCP] through advisory/management agreements."

62. Defendant AR Capital exercised control directly and indirectly over the actions of American Realty in connection with its violations of Section 11 of the 1933 Act as described above. By reason of such conduct, this Defendant is liable to Plaintiffs pursuant to Section 15 of the 1933 Act.

## IV. **EXCHANGE ACT AND COMMON LAW CLAIMS**

63. In this Section of the Complaint, Plaintiffs assert claims based on violations of the Exchange Act and for New York common law fraud.

### A. **Overview Of The Fraud**

#### 1. **Defendant Schorsch's REIT Empire**

64. American Realty's founder, Defendant Schorsch, entered the commercial real-estate business in 1998. In 2006, Defendant Schorsch devised a way to accumulate substantial personal wealth. His strategy consisted of obtaining funds from investors to finance a complex web of interrelated companies, including non-traded REITs, public REITs, research and advisory firms and management companies. He raised money for his non-traded REITs, took them public, and then used those vehicles to buy out other non-traded REITs. Through his vertically integrated real-estate empire, Schorsch collected hundreds of millions of dollars by means of profit-sharing arrangements, director fees, and compensation for research and advisory services that he provided to his related entities.

65. In 2010, Defendant Schorsch founded American Realty, one of his many related entities, and appointed himself Chairman and CEO. Schorsch took American Realty public in

September 2011 and listed the Company on the NASDAQ exchange. American Realty owned and acquired single-tenant, freestanding commercial real-estate properties subject to "net leases." In a net lease, the tenant pays the expenses that are traditionally borne by the landlord, such as building maintenance expenses, property taxes, and insurance. These lease arrangements allowed American Realty to distribute the rent received from its properties, less certain fees, to its shareholders as "dividends." American Realty's tenants included many prominent commercial lessees such as Red Lobster, Walgreens, CVS, Dollar General, FedEx, Family Dollar, GSA, Albertsons, Citizens Bank, and AT&T.

66.     After taking American Realty public, Schorsch kept the Company part of his close-knit network of real-estate companies. American Realty remained a subsidiary of AR Capital, which itself is a subsidiary of RCS Capital, the parent entity of Schorsch's real-estate group. Schorsch also ensured that he maintained complete control over American Realty's business by conducting the Company's daily operations through its operating partnership, ARC Properties. As reflected in the graphic below, these entities were part of an even more complex network of companies that Defendant Schorsch owned and controlled during the Relevant Period.



A Mogul's Property Model

Nicholas Schorsch runs more than 20 real-estate and alternative-investing companies, many of them interrelated and with overlapping management teams.

**Nicholas Schorsch**

Chairman, CEO — **New York REIT** Publicly traded

Chairman — **RCS Capital** Publicly traded

Chairman — **American Realty Capital Properties** Publicly traded company that disclosed accounting irregularities

Chairman, CEO — **AR Capital** Privately held

Owns — **Cole Capital Advisors**

'Mom and pop' investors

Sells shares in nontraded REITs sponsored by AR Capital via financial advisers like LPL Financial, Cetera Financial Group, First Allied to 'mom and pop' investors

Advises and sells shares of nontraded REITs
- Cole Credit Property Trust
- Cole Office & Industrial REIT
- Cole Real Estate Income Strategy

Has sponsored nontraded REITs in the past, including:
- ARC III
- ARC IV

Sponsors nontraded REITs, business development corporations and other partnerships

**Open offerings include**
American Energy Capital Partners
American Realty Capital - Retail Centers of America II
American Realty Capital Daily Net Asset Value Trust
American Realty Capital Global Trust II
American Realty Capital Healthcare Trust II
American Realty Capital Healthcare III
American Realty Capital Hospitality Trust
American Realty Capital New York City REIT
ARC Realty Finance Trust
Business Development Corporation of America
Business Development Corporation of America II
Phillips Edison - ARC Grocery Center REIT II

Source: the companies, securities filings and Robert A. Stanger & Co.  Photo: Keith Bedford for The Wall Street Journal

The Wall Street Journal

67.     Defendant Schorsch maintained control over his real-estate network by occupying executive leadership positions at each one of his interrelated entities.  Until recently, Defendant Schorsch was the Chairman and, in some cases, CEO and President of all of his numerous related real-estate companies, including American Realty.  These companies had overlapping boards of directors and executives, all of whom ultimately reported to Defendant Schorsch, as reflected in the below chart.



| Company | Position |
|---|---|
| **The many roles of Nicholas Schorsch** | |
| American Realty Capital - Retail Centers of America Inc. | Chairman and CEO |
| American Realty Capital Daily Net Asset Value Trust Inc. | Chairman and CEO |
| American Realty Capital Global Trust II Inc. | Chairman and CEO |
| American Realty Capital New York City REIT Inc. | Chairman and CEO |
| ARC Realty Finance Trust Inc. | Chairman and CEO |
| American Realty Capital Trust V Inc. | Chairman and CEO |
| American Realty Capital - Retail Centers of America II Inc. | Chairman, treasurer and CEO |
| Business Development Corp. of America | Chairman and CEO |
| Business Development Corp. of America II | Chairman and CEO |
| Cole Corporate Income Trust Inc. | Chairman, president and CEO |
| Cole Credit Property Trust IV Inc. | Chairman, president and CEO |
| Cole Credit Property Trust V Inc. | Chairman, president and CEO |
| Cole Office & Industrial REIT Inc. | Chairman, president and CEO |
| Cole Real Estate Income Strategy (Daily NAV), Inc. | Chairman, president and CEO |
| New York REIT Inc. | Chairman and CEO |
| American Realty Capital Global Trust Inc. | Chairman |
| American Realty Capital Healthcare Trust II Inc. | Chairman |
| American Realty Capital Healthcare Trust III Inc. | Chairman |
| American Realty Capital Healthcare Trust Inc. | Chairman |
| American Realty Capital Hospitality Trust, Inc. | Chairman |
| American Realty Capital Properties Inc. | Chairman |
| RCS Capital Corp. | Chairman |

68.     Through this elaborate web of corporate arrangements, Defendant Schorsch directly and indirectly controlled the accounting for each of his entities, including American Realty. He also made certain that he profited personally from their operations. Throughout the Relevant Period, Schorsch reaped hundreds-of-millions of dollars in compensation and fees through self-dealing arrangements.

## 2.     The Significance And Importance Of "Adjusted Funds From Operations"

69.     In evaluating American Realty securities, investors largely focused on the Company's AFFO, an important metric by which REIT investors measure anticipated "dividend" payments. The Company stated in its financial statements filed with the SEC that it calculated AFFO by first determining its FFO and then excluding certain balance sheet line items, including acquisition-related fees and expenses, deferred financing costs, non-cash mark-to-market adjustments, and non-cash compensation.

70.     American Realty repeatedly stressed to investors the importance of its reported AFFO throughout the Relevant Period. In its SEC filings, proxy materials, press releases, presentations, and conference calls, the Company represented that its reported AFFO purportedly

allowed investors to evaluate the sustainability of American Realty's long-term operating performance and to compare American Realty's performance with other companies, many of which did not have the Company's level of merger and acquisition activity. For example, in its 2013 Form 10-K, American Realty stated that:

> By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our ongoing operating performance without the impacts of transactions that are not related to the ongoing profitability of our portfolio of properties. We also believe that AFFO is a recognized measure of sustainable operating performance by the REIT industry. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies that are not as involved in activities which are excluded from our calculation.

71.     All of the Company's SEC filings during the Relevant Period reported the Company's purported AFFO, with each of them including a table that supposedly described precisely how the Company calculated its AFFO each quarter. Importantly, American Realty represented in these filings that it calculated AFFO on a "***net basis***." Under this method, only net income and adjustments associated with American Realty's equity interest in the Operating Partnership were supposed to be considered in calculating AFFO. Because American Realty held 96.5% of the equity interest in the Operating Partnership during the Relevant Period, the Company was permitted to "add back" only 96.5% of costs when calculating AFFO.

72.     During and before the Relevant Period, American Realty issued press releases and financial statements that reported "record" AFFO. Moreover, the Company's AFFO each quarter regularly beat its competitors and exceeded analysts' estimates. For example, on May 6, 2013, American Realty reported AFFO for the first quarter of 2013 of nearly $31 million, which was 720% greater than the prior quarter. Then, in the third quarter of 2013, American Realty reported AFFO of $47 million, which was a 40% increase from the prior quarter. On February 27, 2014, the Company again reported "record" financial results and fourth quarter AFFO of $56 million,

which was over 150% more than the AFFO from the corresponding prior year period.  Lastly, on May 8, 2014, the Company reported a record-high AFFO of $147 million for the second quarter of 2014, which was more than 330% greater than what it reported for the same period in 2013.

73.     Additionally, American Realty made numerous references "highlighting" AFFO in the press releases accompanying the filing of its quarterly and annual financial results.  For example, in the press releases accompanying the disclosure of American Realty's financial results for 2013, as well as the first and second quarters of 2014, the Company included as a "highlight" its "increased AFFO."  When commenting on the financial results in the press releases, the Executive Defendants further touted AFFO as a cornerstone of the Company's financial performance:

- "With strong AFFO per share growth, an attractive property portfolio, strong credit tenants bounded by long-term net leases and an attractively positioned balance sheet, we believe ARCP has the catalysts to provide long-term shareholder returns." (Feb. 27, 2014 American Realty Press Release, quoting Defendant Block);

- "We had a record quarter with earnings coming exactly in line with our expectations of $0.26 AFFO per share, consistent with our previously stated guidance for the year." (May 8, 2014 American Realty Press Release, quoting Defendant Schorsch); and

- "The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly de-levering the balance sheet and maximizing value for our stockholders." (July 29, 2014 American Realty Press Release, quoting Defendant Kay).

74.     Analysts relied heavily on the Company's reported AFFO in evaluating American Realty's financial condition and stock price.  For example, Barclays Capital, the Company's financial advisor, assessed the value of American Realty by "calculat[ing] and analyz[ing] the ratio of its current stock price to its calendar year 2014 estimated AFFO based on Wall Street research consensus estimates."  Research analysts at Ladenburg Thalmann, BMO Capital Markets, and JMP Securities similarly evaluated American Realty's stock on a price-to-AFFO basis.  In one analyst

report, for example, JMP Securities concluded that American Realty's price-to-AFFO multiple of eleven-times AFFO – in comparison to its peer group, which had an average price-to-AFFO multiple of fifteen-times – made American Realty a "must own" stock.

75. Unknown to investors at the time, the Company's reported AFFO was not a reliable metric to assess American Realty's true value, the sustainability of its operating performance, or its performance relative to its competitors. The Company's reported AFFO, in fact, provided an inaccurate picture of its financial condition that bore little resemblance to its true financial condition and misled investors into believing that American Realty was an attractive REIT to own.

76. As discussed herein, American Realty has now admitted that the financial statements and non-GAAP financial measures it issued to investors during the Relevant Period were materially false and misleading. American Realty has acknowledged that the Company's Relevant Period financial statements were replete with accounting errors and/or manipulations, resulting in overstated AFFO each and every year during the Relevant Period, with the overstatement reaching as high as 100% in certain quarters. American Realty has also admitted that it understated net losses attributable to stockholders during the Relevant Period, as much as 26% in certain quarters.

### 3. American Realty's Campaign To Rapidly Grow Through Mergers And Acquisitions

77. By reporting favorable AFFO results, American Realty was able to secure capital infusions and garner investor support necessary to allow American Realty to go forward with its stated goal: to convert the Company into an "acquisition machine."

78. According to *The Wall Street Journal,* between 2012 and 2013, American Realty's assets rose nearly 100-fold, from approximately $220 million to $20.5 billion. Moreover, in just three years, American Realty grew into one of the largest REITs in the country, with over $21.3

billion in assets. This rapid expansion was the product of an aggressive merger-and-acquisition campaign, which American Realty was only able to accomplish through the sale to investors of billions of dollars of additional equity and debt securities. The Company's acquisitions include:

- The acquisition of American Realty Capital Trust, III, Inc. ("ARCT III") on February 28, 2013 for $2.2 billion;

- The acquisition of GE Capital Properties on June 28, 2013 for $774 million;

- The acquisition of CapLease, Inc. on November 5, 2013 for $2.2 billion;

- The acquisition of ARCT IV on January 3, 2014 for $3 billion;

- The acquisition of Fortress Group Properties on January 8, 2014 for $601 million;

- The acquisition of Cole, Inc. on February 7, 2014 for $11.2 billion; and

- The acquisition of Red Lobster properties on July 28, 2014 for $1.5 billion.

79. Defendants represented that each of these transactions was favorable to shareholders and added value to the Company. Defendants further represented in connection with these purchases that the Company had the internal controls necessary to properly account for its acquisition activity and had a solid understanding of its financial condition.

80. American Realty's largest merger during the Relevant Period was the Cole Merger. American Realty and Cole, Inc. entered into the Cole Merger Agreement on October 22, 2013, which provided that Cole, Inc.'s shareholders, including Plaintiffs, would receive 1.0929 shares of American Realty common stock, or $13.82, for each Cole, Inc. share.

81. Defendants repeatedly represented to investors that the Cole Merger was beneficial to Cole, Inc. and American Realty shareholders, urging Cole, Inc.'s shareholders to approve the merger and exchange their shares. In SEC filings filed in connection with the Cole Merger, American Realty highlighted how the merger would result in AFFO growth. In a press release accompanying the Cole Merger, Defendant Schorsch commented on the proposed Cole Merger,

stating in pertinent part, "[b]oth companies share the same vision, namely to drive value for stockholders by placing their interests ahead of our own, aligning pay with performance, and reporting fully and transparently." Defendant Block reiterated this point, telling investors that the Company's AFFO after the merger would be "$1.13 to $1.19 per share."

82. On November 5, 2013, Defendants filed with the SEC a registration statement on Form S-4/A related to the Cole Merger ("Cole Registration Statement"). On December 23, 2013, the Company also filed with the SEC a Joint Proxy Statement/Prospectus to Cole, Inc. shareholders ("Cole Merger Proxy"). The Cole Registration Statement and Cole Merger Proxy made numerous representations to investors regarding the Cole Merger, including the financial data for American Realty for the first nine months ended September 30, 2013. The materials represented that the "unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information."

83. Additionally, the Cole Merger Agreement – which was attached to both the Cole Registration Statement and the Cole Merger Proxy and was incorporated by reference in both documents – represented that American Realty's SEC filings and the financial data within those filings were free of material misstatements and omissions. They further represented that American Realty had a system of internal accounting controls that was effective, reliable and sufficient to ensure that American Realty's financial statements were accurate. Among other things, they assured investors that American Realty and its executives had "devised and maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP."

84.     The Cole Merger closed on February 7, 2014.  Unknown to shareholders, American Realty's financial performance was faltering, it was overstating its AFFO by material amounts, and it lacked the represented financial controls necessary to ensure its disclosures were truthful and complete.

### 4.     American Realty's Acquisition Binge Was Highly Profitable For Defendant Schorsch's Empire And American Realty's Executives

85.     American Realty's dramatic growth generated hundreds of millions of dollars in transactional fees and "performance-related" compensation payments for Defendant Schorsch and his entities.

86.     The American Realty "acquisition machine" was designed to and did effectively transfer hundreds of millions of dollars from the Company to entities owned or controlled by Defendants Schorsch and Block, and other senior executives.  Over a period of just three years, the Company paid ARC Advisors "and its affiliates" over $900 million – largely for supposedly acquisition-related "commissions," "fees," "services," and "expenses."  This web of interrelated companies included such similarly named affiliates as ARC Advisors; AR Capital; RCS Securities; RCS Advisory Services, LLC; ARC Advisory Services, LLC; American Realty Capital Advisors III; American Realty Capital Advisors IV, LLC; American National Stock Transfer, LLC; and ARC Real Estate Partners, LLC.

87.     For example, in 2012 and 2013, American Realty transferred to ARC Advisors (headed by Schorsch) "and its affiliates": (i) $240 million for "subordinated distribution fees" and "strategic advisory services," purportedly in connection with the ARCT III and IV Mergers; (ii) more than $66 million for "acquisition related expenses"; (iii) $119 million for "general and administrative expenses"; and (iv) $31 million for "management fees."  Similarly, in connection with the Cole Merger, Schorsch's entities obtained a $32 million payout, including $28 million to

RCS Securities for "financial advisory and strategic services"; $2.9 million to RCS Advisory Services, LLC for "transaction management services"; and $750,000 to RCS Securities and RCS Advisory Services, LLC together for their "[r]etention as non-exclusive advisor and information agent."

88.     Two of American Realty's final cash transfers to ARC Advisors and its "affiliates" underscore Defendants' fraudulent scheme to tax the Company with hundreds of millions of dollars in improper fees and services.  In 2014, the Company paid $20 million to ARC Advisors and its affiliates solely to switch from external management to internal management.  This $20 million payment was evenly split between "post-transaction support services" and "furniture, fixtures, and equipment," which the Company acknowledged could not be substantiated or supported by documentary evidence.

89.     The Company's executives also personally profited from American Realty's acquisition binge.  Over intense shareholder objection, the Company adopted a 2014 Multi-Year Outperformance Plan ("OPP"), which tied executive compensation to the Company's size and reported AFFO.  When the Company's stock price rose as it acquired more companies and recorded higher AFFO, the Company's executives profited.

90.     More specifically, the OPP was divided into two components:  one "absolute" and one "relative."  Each component was measured over a three-year period based on share price appreciation and common stock distributions.  If American Realty achieved a total return to stockholders of more than 7% a year, the plan paid out 4% of the dollar amount of the total return exceeding that benchmark.  Further, if the Company's annual performance exceeded the median total return of a group of peer companies by six percentage points or more, then the OPP paid out an additional 4% of that excess total return.  Under the second "relative" component, the plan paid

participants (including Schorsch and Block) 50% of their incentive compensation even if the Company posted *no* cumulative return to stockholders. Notably, the Compensation Committee allocated the bulk (42.5%) of the OPP's $120 million executive-incentive compensation pool to Schorsch.

91. In total, the proposed OPP provided an executive-incentive compensation pool of $222.1 million for 2014, with 42.5% of the pool allocated to Defendant Schorsch. This incentive compensation was in addition to: (i) Defendant Schorsch's base salary of $1.1 million; (ii) an estimated $8.8 million of non-guaranteed cash bonus and equity awards; and (iii) a "retention grant" worth $24.9 million. Schorsch's total awarded compensation for 2014 alone was estimated at $28.4 million, assuming he achieved only the midrange of the OPP plan, or almost 26 times his guaranteed salary of $1.1 million.

92. American Realty adopted the OPP, notwithstanding a 67.6% non-binding shareholder vote *rejecting* the OPP and a May 16, 2014 Institutional Investor Services ("ISS") report criticizing the plan. As the ISS report explained, the OPP plan was not "rigorous relative to the potential payout values."

**5. Unknown To Investors At The Time, American Realty Intentionally Misstates The Company's AFFO**

93. When calculating AFFO, a company is allowed to "add back" certain transaction and financing costs not associated with operations. When a company has a fractional ownership interest in an operating partnership, however, it is only allowed to "add back" its *pro rata* share of the operating partnership's transaction and financing costs. This is known as calculating AFFO on a "net" basis. This method of calculation differs from a "gross" basis calculation. When AFFO is calculated on a "gross" basis, the company reports income associated with the entirety of an operating partnership and "adds back" the entirety of the transaction and financing costs.

94.     As discussed above, during the Relevant Period, American Realty specifically represented to investors in its SEC filings that it calculated AFFO on a "net" basis – not a "gross" basis.  Unbeknownst to investors, these representations were false.  In a December 18, 2014 verified complaint, American Realty's former CAO, Defendant McAlister, explained that the Company improperly began calculating AFFO on a gross basis – rather than a net basis – "in the fourth quarter of 2013 ('2013 Q4'), and possibly in earlier quarters."  This change, McAlister admitted, was made "suddenly and without any apparent justification or basis."  Through this change, the Company began improperly "add[ing] to and increas[ing] the Company's AFFO by the entirety of the added-back costs, including the portion thereof that should have been attributed to non-controlling interests in the operating partnership."  In so doing, the Company materially overstated its AFFO and provided investors with a distorted picture of the Company's financial condition and the supposed benefits of the Company's numerous acquisitions.

95.     American Realty changed its AFFO calculation, McAlister explained, to mask the true facts about its financial condition, which were unknown to investors at the time.  Contrary to its repeated claims of "record" AFFO and successful acquisitions, the Company's financial performance was "faltering" during the Relevant Period and its acquisitions were negatively impacted on its bottom line.  The Company's accounting improprieties, as McAlister has admitted, were necessary "to avoid public disclosure of the Company's faltering financial performance."

96.     American Realty's top executives were fully aware of, and participated in, the Company's fraudulent accounting.  As set forth in McAlister's verified complaint, when she alerted the Company's former CEO, Defendant Kay, to the Company's improper accounting of AFFO, he directed her and Defendant Block "not to change or correct the fraudulent reports."  Defendant Schorsch similarly instructed Defendants Block and McAlister not to correct the

Company's fraudulent financials. As McAlister recounted, on or about July 28, 2014, Defendant Schorsch "directed Mr. Block [during a telephonic conference call] to conceal the previous improper reporting."

97. The Company perpetuated its accounting fraud by devising ways to conceal it from investors. According to McAlister, Defendant Schorsch instructed CFO Block "to take steps to cover up the improper change in accounting and unlawfully misleading financial reports." Defendants Schorsch and Kay also directed Block and McAlister to "change[] the beginning point for its AFFO calculation from 'net loss attributable to stockholders (in accordance with U.S. GAAP)' to 'net loss (in accordance with U.S. GAAP).'" The goal of these changes, McAlister has revealed, was to "ma[k]e it more difficult for stockholders to see the fraudulent change in the add-backs of non-recurring transaction and deferred financing costs."

98. American Realty and its top executives also threatened, intimidated, and terminated employees who attempted to interfere with the Company's fraud. Defendant McAlister has explained how she "repeatedly expressed her concerns regarding Mr. Schorsch's instruction to shift and reallocate the funds in the 2014 Q2 report." When these issues were raised, however, "members of senior management either ignored Ms. McAlister's concerns regarding erroneous accounting practices, or berated Ms. McAlister for calling attention to them." Indeed, shortly after "blowing the whistle," McAlister was "retaliat[ed]" against and terminated as the "scapegoat."

99. In July 2014, Defendant McAlister explained that she emailed Jessica Estrada, a Manager at Grant Thornton, and informed her of the false and misleading nature of American Realty's financial statements. Rather than investigate, Grant Thornton partner Richard LeFleur and Ms. Estrada directed Defendant McAlister to sign and file with the SEC the Company's 2Q14 Form 10-Q and file the accompanying false financial statements.

**American Realty's Audit Committee
          Discloses That Certain Of Its Top Officers
          Intentionally Misrepresented The Company's AFFO**

100.    The Audit Committee also revealed that the Company's CAO, Defendant McAlister, and CFO, Defendant Block, had been terminated. These officers, the Audit Committee made clear, were implicated and responsible, at least in part, for the Company's accounting fraud. Indeed, because of these Defendants' "key roles in the preparation of [certain erroneous] financial statements," the Audit Committee concluded that the Company's 2013 financials prepared by these Defendants merited additional review and should not be relied upon. Even though the Audit Committee's preliminary finding of intentional misconduct was limited to the Company's financial statements for first and second quarter of 2014, the Audit Committee cautioned that the Company's upcoming review "could identify further adjustments."

101.    The Company's Audit Committee further found that American Realty's internal controls over financial reporting were materially deficient. On this subject, the Audit Committee explained that "the Company is reevaluating its internal control over financial reporting and its disclosure controls and procedures" and "intends to make the necessary changes to its control environment to remediate all control deficiencies that are identified as a result of the ongoing investigation and the restatement process."

102.    After issuing its press release on October 29, 2014, American Realty held a conference call with investors to discuss the Company's revelations. During the call, Defendant Kay adopted and repeated the Audit Committee's findings set forth in the Company's press release. He explained how, on September 7, 2014, an American Realty employee contacted the Audit Committee and reported accounting improprieties. He further explained that, for the first quarter of 2014, AFFO was supposed to be calculated on a "net" basis, with any adjustments to net loss multiplied by approximately 96.5% to reflect American Realty's interest in the Operating

Partnership. As Defendant Kay admitted, however, American Realty improperly calculated AFFO on a "gross" basis during the first quarter of 2014, making adjustments to net loss based on the full results of the Operating Partnership. As a result, American Realty added back more adjustments than it should have, which resulted in an improperly inflated AFFO. Defendant Kay further admitted that the Company's fraudulent accounting improperly increased AFFO for the first quarter of 2014 by $17.6 million, artificially inflating AFFO to $0.26 per share when it should have been only $0.23 per share. The Company again fraudulently manipulated its financials in the second quarter of 2014 by, among other things, moving approximately $10.5 million of second quarter 2014 expenses to the third quarter of 2014 to "***conceal the error from the [prior] quarter***." In so doing, the Company reported an artificially low net loss for the second quarter of 2014. As Defendant Kay acknowledged, "***we had some bad judgment there***." Defendant Kay also attempted to assure the market that the Company had the issue under control and that "[n]one of the executives that are currently at the Company have been implicated during the investigation related to the concealment of that error."

103. Analysts were stunned by the Company's October 29, 2014 disclosures. Wells Fargo Securities reported that "this morning's announcement will be a significant setback for the company in terms of earning or maintaining investor trust, credibility, and allaying investor skepticism." JMP Securities similarly concluded that an "Accounting Fraud [had been] uncovered," and that "management's credibility, which was already under scrutiny, took a further impairment." Analysts at J.P. Morgan Securities further concluded that, as a result of the revelation of the accounting fraud, "[American Realty]'s credibility is likely impugned for some period of time," and "capital costs will be higher in the near term . . . thus making growth more difficult." Commentator Jim Cramer remarked that, when he read the Company's disclosure, his "heart

jump[ed] out of [his] throat" because the October 29 disclosure made clear that American Realty's senior executives "knew and did nothing" to correct the Company's misstatements.

104. Credit rating agencies also responded swiftly to the Company's disclosures. Within hours of the news, Standard & Poor's placed American Realty's debt rating on downgrade "watch." Moody's also placed the Company's corporate debt rating under review, explaining that the "purposeful hiding of the accounting error engenders questions about the company's credibility and maintenance of investor trust."

105. Federal and state regulators also responded to the Company's revelations. After the close of trading on October 29, 2014, *The Wall Street Journal* reported that the SEC "intends to launch an inquiry into the accounting irregularities" at American Realty. As *The Wall Street Journal* explained, "the revelation is a black eye for Mr. Schorsch, chairman of American Realty Capital and one of the biggest real-estate investors in the U.S." The following day, analysts at Ladenburg Thalmann stated that the revelations were "highly disappointing" and noted that, per *The Wall Street Journal* article, "[m]ore shoes could drop as probe could find additional issues and more agencies get involved." Indeed, on October 31, 2014, *Reuters* reported that the FBI and the U.S. Attorney's Office for the Southern District of New York had now "opened a criminal probe of [American Realty] in the wake of the real estate investment trust's disclosure that it had uncovered accounting errors."

106. These revelations severely impacted American Realty's business operations. On November 3, 2014, American Realty announced that RCS Capital had terminated its $700 million agreement to purchase an American Realty subsidiary, Cole Capital. In terminating the agreement, RCS Capital cited the "recent disclosures by [American Realty] on October 29, 2014, and the matters arising with respect to such disclosures."

107.     The Company's October 29, 2014 revelations also caused the price of American Realty's stock to decline markedly.  On the day of the press release, American Realty's stock price dropped from $12.38 to $10.00, a decline of more than *19%*, on extremely high trading volume of 231 million shares.  The stock price fell by an additional *17%* during the next three trading days, as more revelations were made and the impact of the accounting fraud was further disclosed and appreciated by investors.  In total, the Company's disclosures caused the Company's stock price to fall by over *36%* in only three trading days, erasing over *$4 billion* in market capitalization.

### 7.     **Defendants Schorsch, Kay And Beeson Unexpectedly "Resign"**

108.     Following the October 29, 2014 disclosures, the Company committed to restate its financials by November 2014, but failed to do so.  This failure prompted the NASDAQ to issue a notice to the Company that it was "not in compliance with NASDAQ Listing Rule 5250(c)(1) that requires timely filing of reports with the [SEC]."

109.     On December 15, 2014, the Company announced that the employment of its founder, Defendant Schorsch, its CEO, Defendant Kay, and its COO, Defendant Beeson, had all been terminated effective immediately.   The press release announcing these unexpected terminations stated that these long-time American Realty executives were immediately relieved from their "employment or board positions held with the Company, its subsidiaries and certain Company-related entities."  The press release assured investors that, "[i]n connection with Mr. Schorsch's departure as Executive Chairman, American Realty will be unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder."

110.     Thus, within six weeks of the Restatement, *every senior executive employed by the Company during the Relevant Period* – its Chairman, CEO, COO, CFO, and CAO – had been

asked to leave the Company or been terminated, with the former CAO **suing the Company** for terminating her after she "blew the whistle" on the accounting fraud.

### 8. American Realty Confirms That It Falsified Four Years Of Financials And Suffered Material Weaknesses Over Internal Controls

111.    American Realty's Audit Committee disclosed on March 2, 2015 the results of its investigation and filed amendments to: (1) the 2013 Annual Report (the "Amended 2013 Annual Report"); (2) the 2014 First Quarter Report (the "Amended 2014 First Quarter Report"); and (3) the 2014 Second Quarter Report (the "Amended 2014 Second Quarter Report" and, together with the Amended 2013 Annual Report and the Amended 2014 First Quarter Report, the "Amended Reports").

112.    In the Restatement, American Realty admitted that its financial statements during the Relevant Period violated GAAP (and many of the Company's critical accounting policies) in numerous ways, *including by falsely reporting AFFO throughout the entirety of the Company's four-year history*.  The Restatement was necessitated by Defendants' material misstatement of, *inter alia*, American Realty's:  (i) operating loss; (ii) loss from continuing operations; (iii) net loss; and (iv) net loss per share, as detailed in the Company's amended Annual Report for 2013 and amended Quarterly Reports for the first the two quarters of 2014.

**Amended 2013 Annual Report's Adjustments**

113.    The Audit Committee confirmed in the Amended 2013 Annual Report that the Company had materially misrepresented AFFO in its 2013 Annual Report.  Specifically, the Audit Committee confirmed that American Realty overstated AFFO in the 2013 Annual Report by $44.0 million, or 18.6%.  Further, the accounting errors identified by the Audit Committee resulted in the understatement in the 2013 Annual Report of the Company's net loss.

114.     The Audit Committee admitted that American Realty overstated AFFO in the 2013 Annual Report by, among other thing, representing that it had calculated AFFO on a "net" basis when, in fact, the adjustments to net loss were calculated on a "gross" basis.  The Company also artificially inflated its AFFO by improperly including operating fees incurred to affiliates in performing the AFFO calculation.

115.     The Audit Committee also identified a number of GAAP violations in the 2013 Annual Report, including the improper classification of $75.7 million of expenses as purportedly merger and non-routine transaction-related expenses when, in fact, they should have been classified as recurring, general and administrative expenses.  The misclassified expenses included, among other things, $59.6 million in equity-based compensation.

116.     The Audit Committee also admitted that the 2013 Annual Report misclassified $13.0 million of management fees as merger and other non-routine transaction-related expenses when, in reality, they should have been classified as management fees to affiliates. The 2013 Annual Report also misclassified $5.9 million of expenses as merger and other non-routine transaction-related expenses when, in fact, they should have been capitalized as deferred financing costs and amortized accordingly.  The 2013 Annual Report also neglected to use the carryover basis of accounting for the ARCT IV Merger.

117.     The Audit Committee also admitted that it found no evidence of receipt of materials that the Company purportedly had purchased in connection with its merger with ARCT III.  These materials included furniture, fixtures, equipment and other assets that it used to capitalize $4.1 million of costs and to expense another $1.7 million of costs in its original 2013 Form 10-K.  The 2013 Annual Report also should have, but failed, to record a controlling interest transfer tax liability totaling $8.9 million resulting upon the completion of the ARCT III Merger and CapLease

Merger and failed to take an impairment loss of $3.3 million to account for the fact that two of its real-estate properties were impaired and that it may be unable to recover the carrying amounts of those properties.

118.    Accounting for the true effects of American Realty's acquisition of ARCT IV, the Company admitted that its previously-reported net loss attributable to stockholders was understated in the 2013 Annual Report by $16.759 million, or 3.53%.

**Amended 2014 First Quarter Report's Adjustments**

119.    The Audit Committee further confirmed in the Amended First Quarter Report that Defendants: (1) failed to fix the overstatements of AFFO in the 2013 Annual Report, despite knowing the reported figures were false; and (2) failed to prevent the Company from repeated its improper calculation of AFFO in the 2014 First Quarter Report. In this regard, the Amended 2014 First Quarter Report admits that "[p]rior to the filing of the Quarterly Report on Form 10-Q for the first quarter of 2014, some members of senior management were aware of [the AFFO calculation] errors but allowed the [2014 First Quarter Report] to be filed without completing an analysis of the errors."

120.    Based on the Amended 2014 First Quarter Report, American Realty overstated AFFO in the 2014 First Quarter Report by $38.5 million, or 26.1%.  The Audit Committee investigation confirmed that senior management "considered AFFO to be an important metric used by analysts and investors in evaluating the Company's performance and, for the first two quarters of 2014, sought to maintain reported AFFO within the 2014 guidance range of $1.13 to $1.19 per share announced at the end of 2013."

121.    The Audit Committee has admitted that American Realty overstated AFFO in the 2014 First Quarter Report by, among other thing, representing that it had calculated AFFO on a

"net" basis when, in fact, the adjustments to net loss were calculated on a "gross" basis. The Company also violated GAAP by classifying $9.4 million of expenses as merger and other non-routine transaction-related expenses when, in fact, they should have been classified as recurring general and administrative expenses. In addition, American Realty improperly classified $16.1 million of merger and other non-routine transaction-related expenses in the first quarter of 2014 when, in fact, most of that amount should have been recorded in 2013. Furthermore, upon entering into the ARCT IV Merger, the Operating Partnership entered into an agreement with an affiliate to acquire furniture, fixtures, equipment and other assets, capitalizing $2.1 million of these costs despite the fact that there was no evidence of receipt of those materials.

122. Additional errors included: (1) improperly recording $20.6 million of expenses as merger and other non-routine transaction-related expenses when, in fact, such expenses should have been capitalized as deferred financing costs and amortized accordingly; (2) failing to properly record a controlling interest transfer tax liability upon the consummation of the ARCT III Merger; and (3) improperly classifying $13 million of management fee expenses as merger and other non-routine transaction-related expenses when, in fact, they should have been classified as management fees to affiliates.

**Amended 2014 Second Quarter Report's Adjustments**

123. The Audit Committee further admitted in the Amended 2014 Second Quarter Report that the Company's senior management had fraudulently hid American Realty's false reporting of AFFO through accounting manipulations, including by changing its approach to calculate AFFO on a gross basis. As stated in the Amended 2014 Second Quarter Report, American Realty's errors in calculating AFFO "were intentionally not corrected, and other AFFO and

financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014."

124.     The Audit Committee also determined that the Company had improperly failed to account in the 2014 Second Quarter Report for numerous expenses.   In particular, the Audit Committee identified, among other things: (1) $1.2 million of merger and other non-routine transaction-related expenses that should have been recorded during the second quarter; (2) $5.8 million of annual bonus payments that should have been accrued for and expensed as of and for the period ended June 30, 2014, in accordance with the Company's accounting policy of accruing estimated bonuses throughout the year; (3) $1.8 million of losses due to the Company's failure to properly classify a property as held for sale as of June 30, 2014; and (4) a $1.1 million credit for interest expense that was incorrectly recorded in the three and six months ended June 30, 2014.

125.     Moreover, the Audit Committee identified numerous additional GAAP errors and mischaracterizations made by American Realty, including: (1) $0.8 million of costs that were improperly classified as merger and other non-routine transaction-related expenses that should have been capitalized as deferred financing costs and amortized accordingly; (2) $5.2 million that were improperly classified as merger related expenses when, in fact, they should have been accounted for as general and administrative expenses; (3) $0.7 million that were improperly classified as merger and other non-routine transaction-related expenses that should have been classified as acquisition-related expenses; (4) $0.5 million of general and administrative salary expense that had been improperly recorded as acquisition-related expenses in the three months ended June 30, 2014; (5) $1.0 million of acquisition-related salary expense that had been improperly recorded as general and administrative, resulting in a net understatement of acquisition-related expenses of $0.5 million; (6) $1.8 million of acquisition-related expenses had been

recorded twice in the three and six months ended June 30, 2014; (7) $2.2 million in tax expenses, which was taken as a result of the restatement corrections; (7) a $1.8 million swap interest payment that was incorrectly classified as a loss on derivative instruments; and (8) $5.0 million of debt extinguishment costs, which were originally reported as interest expense, that should have been reported as a separate line item caption within the consolidated statements of operations.

126.     American Realty's improper accounting resulted in its overstatement of AFFO in the 2014 Second Quarter Report by 9.4%, or $19.3 million.  It further allowed the Company to understate its net loss for the second quarter by 30.8%, or $13.3 million.

**Self-Dealing Actions**

127.     The Audit Committee also found multiple instances of self-dealing by Schorsch and his colleagues.  In 2013, a subsidiary of ARC Real Estate purchased a historic building in Newport, Rhode Island – the Audrain Building. Schorsch used the first floor of the Audrain Building to house his vintage car collection.  Meanwhile, Schorsch leased the second floor of the Audrain Building to American Realty and had American Realty pay for $8.8 million in tenant improvements, furniture and operating expenses.  Notably, American Realty never moved into or occupied the building.   Following the Audit Committee's investigation, American Realty terminated the lease agreement in November 2014.

128.     The Audit Committee further found that Schorsch and Block had been awarded American Realty stock than had not been authorized by the Compensation Committee of the Company.

129.     Upon their departures, both Block and Schorsch relinquished all of their equity awards, with the exception of 1,000,000 shares of restricted stock that Schorsch received, which had vested.  According to American Realty, those vested shares may be clawed back by American

Realty if Schorsch is determined to have breached his fiduciary duty of loyalty, engaged in fraud, or committed misconduct in connection with his responsibilities as an American Realty director or officer.

**American Realty Admits To Material Weaknesses In Its Internal Controls During The Relevant Period**

130.    American Realty admitted in the Amended 2013 and 2014 Reports that the Company's prior representations concerning the effectiveness of its internal controls were false.

131.    The material weaknesses that existed in 2013 were never remediated, and in 2014, American Realty developed additional material weaknesses. The Amended 2014 First Quarter and Second Quarter Reports identified the following additional deficiencies: a failure to (1) emphasize the importance of adherence to the Company's Code of Business Conduct and Ethics; (2) establish appropriate policies and procedures surrounding the accounting treatment and classification of merger-related expenses, goodwill, impairments and purchase accounting; (3) establish controls designed to prevent changes to the financial statements and supporting financial information by senior management without the proper levels of review, support and approval; and (4) establish controls designed to ensure that accounting employees would not be subject to pressure to make inappropriate decisions affecting the financial statements and/or the financial statement components of the calculation of AFFO, and that accounting concerns raised by employees would be timely and appropriately addressed by senior management.

132.    The Audit Committee also recognized three other material weaknesses in American Realty's internal controls over financial reporting:

- **Cash Reconciliations and Monitoring** - The Company did not implement appropriate controls to record payments received and to reconcile its cash receipts and bank accounts on a timely basis.

- **Information Technology General Controls - Access, Authentication and Information Technology Environment** - The Company did not maintain effective

information technology environmental and governance controls, including controls over information systems security administration and management functions in the following areas: (a) granting and revoking user access rights; (b) timely notification of user departures; (c) periodic review of appropriateness of access rights; (d) physical access restrictions; and (e) segregation of duties.

- **Information Technology General Controls Over Management of Third Party Service Providers** - When the transition services agreement between the Company and [ARC Properties Advisors, LLC] was terminated on January 8, 2014, the Company did not enter into a follow-on formal agreement with the affiliate of [ARC Properties Advisors, LLC] that managed technology infrastructure and systems significant to the Company's financial reporting process. Without a formal agreement governing the delivery of services, the Company's management cannot make any assertions about the operating effectiveness of the third party service provider's controls over information systems, programs, data and processes financially significant to the Company or the security of the Company's data under the control of the related third party service provider.

133. As American Realty's auditor, Grant Thornton LLP, admitted in the Amended 2013 Annual Report: "In our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria ***the Company has not maintained effective internal control over financial reporting as of December 31, 2013.***" Grant Thornton further acknowledged in American Realty's 2014 Form 10-K, a host of material weaknesses, including the Company's: (i) "failure to implement and maintain an effective internal control environment"; (ii) "failure to maintain controls associated with related party transactions and risks arising from contractual arrangements with affiliates"; (iii) "failure to maintain controls related to stock based compensation, including documentation of key terms of awards and the administration of certain restricted stock awards"; (iv) "failure to establish appropriate policies, procedures and controls in the internal control environment, including those related to the accounting close process, critical accounting estimates and non-routine transactions"; (v) "failure to monitor and reconcile cash"; and (vi) "failure to maintain effective information technology environmental and governance controls, including management of system access and third party service providers."

As a result of these material weakness, Grant Thornton concluded that ***"the Company has not maintained effective internal control over financial reporting as of December 31, 2014."***

134.    Finally, the Company confirmed in its Restatement that it was under multiple government investigations as a result of the disclosure of the accounting fraud.  Specifically, the Company stated that the SEC had "commenced a formal investigation and issued subpoenas calling for the production of various documents" and that "the United States Attorney's Office for the Southern District of New York contacted counsel for the Audit Committee and counsel for the Company with respect to this matter."  The Company further disclosed that "the Secretary of the Commonwealth of Massachusetts issued a subpoena calling for the production of various documents."

### B.    Additional Allegations Of Scienter

135.    Defendants American Realty, ARC Properties, Schorsch, Kay, Block, Beeson and McAlister acted with scienter with respect to the materially false and misleading statements and omissions discussed herein.

136.    American Realty has admitted that the Company acted with scienter when it issued false and misleading financials.  As discussed above at ¶¶100-07, the Company's October 29, 2014 press release stated that its executives had "identified" misstatements in the Company's financials for the three months ended March 31, 2014 and the six months ended June 30, 2014, but nevertheless "intentionally" did not correct them.  The Company has further admitted that the misstatements in its financials during the second quarter of 2014 were "intentionally made" and deliberately concealed from investors.  In addition, the Company has recognized that its internal controls over financial reporting and public disclosure were materially deficient – a fact which the Company and its top officers knew or were severely reckless in not knowing throughout the Relevant Period.

137. Defendant Schorsch was American Realty's founder, CEO, and Chairman and, as such, was familiar with, and exercised substantial control over, every aspect of American Realty's business, including its calculation and reporting of AFFO and the effectiveness of the Company's internal controls over financial reporting. As discussed herein, Defendant Schorsch directed American Realty's CFO, Defendant Block, to improperly report the Company's AFFO. Defendant Schorsch also directed Defendant Block and others to conceal the Company's improper accounting by fraudulently deferring the accrual of second quarter expenses. Knowing these facts, Defendant Schorsch nevertheless certified the accuracy of American Realty's financial results and the adequacy of its internal controls in American Realty's financial filings throughout the Relevant Period. Defendant Schorsch's scienter is further demonstrated by the decision of American Realty's independent directors on or about December 15, 2014 to sever all ties between American Realty and Defendant Schorsch and ask him to "step down."

138. Defendant Block was American Realty's CFO, and, as such, had ultimate responsibility for American Realty's finances. In addition, Defendant Block was familiar with, and exercised substantial control over, American Realty's business, including its calculation and reporting of AFFO and the effectiveness of its internal controls over financial reporting and disclosure. As discussed herein, Defendant Block was aware that American Realty's financial statements contained errors related to the calculation of AFFO, yet he did nothing to correct those errors. In fact, Defendant Block certified the accuracy of American Realty's financial statements, as well as the adequacy of American Realty's internal controls throughout the Relevant Period, despite knowing that the Company's financial statements did not accurately reflect the Company's true financial condition. In addition, as discussed above at ¶¶100-02, Defendant Block attempted to conceal the Company's improper accounting by converting to the "gross" method of reporting

AFFO and fraudulently deferring the accrual of second quarter expenses. As the Audit Committee explained in its October 29, 2014 disclosure, Block had a "key role[] in the preparation" of the fraudulent reports, which led to his immediate termination and necessitated a review of prior financial statements that he had approved.

139. Defendant McAlister, American Realty's CAO, was a member of American Realty's senior management, and was in charge of American Realty's accounting. As Defendant McAlister admitted in her verified complaint, she knew that American Realty's financial statements contained errors related to the calculation of AFFO, yet she failed to correct those errors. Defendant McAlister also was aware that Defendant Schorsch directed Defendant Block to conceal the improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses. Defendant McAlister nevertheless signed American Realty's SEC filings despite knowing of the fraudulent accounting contained in the Company's financials. As the Audit Committee explained in its October 29, 2014 disclosure, McAlister had a "key role[] in the preparation" of the fraudulent reports, which led to her immediate termination and necessitated a review of prior financials that she had approved.

140. As American Realty's President and CEO, Defendant Kay was a member of American Realty's senior management, was responsible for the Company's day-to-day operations, and was familiar with American Realty's internal controls. As discussed herein, Defendants Block and McAlister brought the improper AFFO accounting to Defendant Kay's attention. In response, however, "Mr. Kay told Ms. McAlister and Mr. Block **not** to change or correct the fraudulent reports, in an apparent effort to avoid public disclosure of the Company's faltering financial performance." As the result of his day-to-day control over American Realty, Defendant Kay also knew, or was reckless in not knowing, that Defendant Schorsch directed Defendants Block and

McAlister to conceal the improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses. Defendant Kay's scienter is further demonstrated by the fact that he was asked to step down from his position at American Realty on or about December 15, 2014.

141. As American Realty's President and COO, Defendant Beeson was a member of American Realty's senior management, was responsible for the Company's day-to-day operations, and was familiar with American Realty's internal controls. As discussed herein, Defendant McAlister, by her own admission, brought the improper AFFO accounting to Defendant Beeson's attention, specifically informing Beeson that American Realty had misrepresented AFFO. As the result of her day-to-day control over American Realty, Defendant Beeson also knew, or was reckless in not knowing, that Defendant Schorsch directed Defendants Block and McAlister to conceal the improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses. Defendant Beeson's scienter is further demonstrated by the fact that she was asked to step down from her position at American Realty on or about December 15, 2014.

142. Further facts support a strong inference of scienter for the Defendants listed above. As detailed above, American Realty and its executives repeatedly told investors that the Company had achieved "record" AFFO, emphasizing that this financial metric was a particularly important measure to evaluate the Company's stock. As summarized above, at each reporting period during the Relevant Period, these Defendants singled out the Company's purportedly strong AFFO. These Defendants were aware of the fact that the market was relying on these statements, as analysts published numerous reports that underscored the Company's "record" AFFO. Given that these Defendants repeatedly stressed to investors that AFFO was a critical measure of the Company's

financial health, any failure to confirm that their repeated statements about the Company's AFFO were materially accurate supports an inference of scienter.

143. The nature, duration, and scope of Defendants' misconduct further supports a strong inference of scienter. As admitted in the Restatement, the Company falsified its reported operating performance and financial statements for ***each and every reporting period*** since the Company went public in 2011. The Company has further acknowledged that its financial statements during the Relevant Period (and beforehand) were riddled with accounting errors and/or financial manipulations, resulting in understated net losses attributable to stockholders by as much as 26% in certain quarters. Likewise, the Company has admitted that it overstated its AFFO per share each and every year during the Relevant Period, with the overstatement reaching as much as ***100%*** in certain quarters.

144. Finally, the accounting scheme allowed management to pursue and execute a rapid-fire, growth-by-acquisition strategy that generated over $900 million in fees, commissions, and incentive compensation, providing a motive to commit fraud.

## C.     Materially False And Misleading Statements

145. Before and during the Relevant Period, Defendants made materially false and misleading statements and omissions concerning American Realty's financial performance and condition, and the effectiveness of its internal controls. These misstatements caused American Realty shares to trade at artificially inflated prices both prior to and throughout the Relevant Period, and allowed the Company to carry out its "growth by acquisition" strategy using inflated American Realty shares.

### 1. False And Misleading Statements Before Plaintiffs' Purchases In The Relevant Period

146. American Realty became a publicly-traded company on September 7, 2011. In its initial public offering ("IPO"), the Company sold 5.58 million shares of common stock at $12.50 per share for proceeds of $69,750,000. The IPO Registration Statement also stated that American Realty had prepared its financial statements "in conformity with accounting principles generally accepted in the United States of America [which] requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period."

147. During the approximately two-year period from the Company's IPO to the start of the Relevant Period, American Realty regularly issued press releases, which were filed with the SEC on Forms 8-K, announcing the Company's quarterly and annual financial results, including reported AFFO and earnings, as set forth in the table below. After announcing its quarterly and annual financial results, American Realty also filed reports with the SEC on Forms 10-Q and 10-K signed by Defendants Schorsch and Block that reiterated the Company's previously reported financial results, as set forth in the table below. The Forms 10-Q and 10-K further represented that the financial results were accurate and presented in accordance with GAAP, and contained SOX Certifications signed by Schorsch and Block.

| Period | Document | Reported AFFO Total / Per Share | Reported Earnings (Loss) Total / Per Share |
|--------|----------|-------------------------------|-------------------------------------------|
| 3Q 2011 | 8-K filed 11/14/11 10-Q filed 11/14/11 | $287,000 / $0.17 | ($634,000) / ($0.42) |
| 4Q 2011 | 8-K filed 3/19/12 10-K filed 3/19/12 | $1.5 million / $0.23 | ($1,117,000) / ($0.17) |
| 1Q 2012 | 8-K filed 5/8/12 10-Q filed 5/9/12 | $1.6 million / $0.22 | ($630,000) / ($0.09) |

| Period | Document | Reported AFFO Total / Per Share | Reported Earnings (Loss) Total / Per Share |
|--------|----------|--------------------------------|--------------------------------------------|
| 2Q 2012 | 8-K filed 7/31/12 10-Q filed 8/1/12 | $1.9 million / $0.25 | ($2.04 million) / ($0.28) |
| 3Q 2012 | 8-K filed 10/29/12 10-Q filed 10/29/12 | $3.1 million / $0.28 | ($804,000) / ($0.09) |
| 4Q 2012 | 8-K filed 2/28/13 10-K filed 2/28/13 | $10.5 million / $1.08 full year | ($7.3 million) / ($0.84) |
| 1Q 2013 | 8-K filed 5/6/13 10-Q 5/6/13 | $30.8 million / $0.20 | ($137.9 million) / ($0.90) |
| 2Q 2013 | 8-K filed 8/6/13 10-Q filed 8/6/13 | $32.8 million / $0.19 | ($51.7 million) / ($0.32) |

148.     The statements made in the IPO Registration Statement, Forms 10-K, Forms 10-Q, press releases and accompanying conference calls, as well as the 2013 Shelf Registration Statement, described in ¶¶34-39, 146 were each false and misleading when made in that each omitted and/or misrepresented material facts.   The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     the reported AFFO figures were materially false and the product of accounting tricks, including unsubstantiated changes to accounting entries;

| **AFFO Per Share** **Misstatements** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | FY11 | FY12 | 1Q13 | 2Q13 | 3Q13 | 4Q13 | FY13 | 1Q14 | 2Q14 |
| Reported AFFO per share | $ 0.60 | $ 0.47 | $ 0.20 | $ 0.19 | $ 0.30 | $ 0.38 | $ 1.07 | $ 0.26 | $ 0.24 |
| Restated AFFO per share | $ 0.56 | $ 0.46 | $ 0.10 | $ 0.18 | $ 0.28 | $ 0.29 | $ 0.87 | $ 0.19 | $ 0.21 |
| % Overstatement | 7.1% | 2.2% | 100.0% | 5.6% | 7.1% | 31.0% | 23.0% | 36.8% | 14.3% |

(b)     the financial statements, including reported AFFO and earnings (or losses) were materially false and misleading, did not accurately portray the Company's financial performance, and were not prepared in accordance with GAAP;

(c)     the Company lacked the internal financial and disclosure controls necessary to ensure that: (i) its SEC filings were timely reviewed for accuracy; (ii) the estimates used to

formulate its reported AFFO were reasonable and appropriately calculated; (iii) its reported AFFO was accurate; (iv) its formulation of AFFO guidance was reasonable, as was the Company's periodic reassessment of the ability to meet that guidance; (v) material changes made by management to American Realty's SEC filings and public statements were approved by the Audit Committee before dissemination; (vi) the Company could assess, authorize and monitor millions of dollars of related-party transactions, overseen by Schorsch and Block, between ARC Advisors and its affiliates, each of which was owned and/or controlled by Schorsch, Block and other senior executives; (vii) the Company could calculate and track multimillion dollar grants of equity-based compensation; and (viii) the Company could undertake basic reconciliation and monitoring functions necessary to enable it to timely record and reconcile cash payments that it had received;

(d)        that Schorsch and Block were aware from their review and evaluation of the effectiveness of the Company's internal controls and financial reporting processes that the Company lacked reliable internal controls over financial reporting;

(e)        that the only way the Company could post AFFO growth at the reported levels was by making additional acquisitions using American Realty securities that were artificially inflated as a result of the wrongdoing detailed herein;

(f)        that the Company had not consistently grown its earnings (nor had its "core earnings" increased significantly), as its reported earnings and AFFO were the product of accounting manipulations; and

(g)        that, as a result of (a)-(f) above, American Realty, Schorsch and Block had no reasonable basis to believe, and in fact did not believe, that American Realty's financial statements were accurate and free from material misstatements and omissions.

149.    In addition to the statements referenced above, Defendants made numerous other materially false and misleading statements to the market during the period between American Realty's IPO and the start of the Relevant Period.  These statements inflated the prices of American Realty shares, thus facilitating the Company's acquisition spree and enabling the Company and its top executives to reap hundreds of millions of dollars in improper transactional fees and bonuses. Thus, by the start of the Relevant Period, the market price of American Realty stock was already inflated as a result of the misconduct alleged herein.

## 2.    False And Misleading Statements During The Relevant Period

### a)    Cole Merger Announcement And Press Release

150.    On October 22, 2013, American Realty and Cole, Inc. entered into the Cole Merger Agreement.  Pursuant to the agreement, Cole, Inc. shareholders would receive either 1.0929 shares of American Realty common stock or $13.82 in cash per Cole, Inc. share.

151.    On October 23, 2013, American Realty and Cole, Inc. issued a press release entitled "American Realty Capital Properties and Cole Real Estate Investments Merge to Create World's Largest Net Lease REIT with Enterprise Value of $21.5 Billion" ("Cole Merger Press Release"). That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  In connection with the proposed merger, American Realty issued "updated 2014 AFFO guidance of $1.13 to $1.19 per share, an increase of approximately 25% over . . . 2013 AFFO per share guidance of $0.91 to $0.95." Schorsch commented on the proposed Cole Merger, stating, in pertinent part, "[b]oth companies share the same vision, namely to drive *value for stockholders by placing their interests ahead of our own,* aligning pay with performance, *and reporting fully and transparently*."

152.    Later that day, American Realty held a conference call with analysts and investors to discuss the merger.  During the conference call, executives from both companies continued to tout the supposed benefits of the merger for shareholders.  Defendant Schorsch stated:

> ***This is an epic transaction.  Great companies combining in a win-win to the shareholders, the employees and the broker-dealer systems that we work with. The portfolios just fit.  They fit very, very well.  We're a much stronger company.***
>
> We have a – we have both proven ourselves.  And if you look back at the last six months, as we've gone through this transaction, ***we as a company have improved at American Realty – we've become investment-grade rated; we've managed our balance sheet and a number of other mergers to build a larger company of over $10 billion on a pro forma basis . . . today, we have created, with this merger, the largest net lease company on the globe***.

153.    The statements referenced above in ¶¶151-52 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a)     As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions (ii) maintain adequate controls over various grants of equity-based compensation; and (iii) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(b)     American Realty's financial statements were materially false and misleading, did not accurately reflect the Company's financial performance, and were not prepared in conformity with GAAP;

(c)     American Realty's 2014 AFFO estimates and related statements about its projected earnings growth were not accurate, attainable, honestly believed, or founded on a reasonable basis.  As Defendants knew but omitted to disclose to investors, American Realty's

claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(d)     The Company admitted in connection with its Restatement that American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing; and

(e)     American Realty's acquisition program was not beneficial for American Realty shareholders, but instead, by design, generated transaction fees for Schorsch-controlled companies and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.

### b)     Third Quarter 2013 Financial Results

154.    On November 7, 2013, American Realty issued a press release entitled "American Realty Capital Properties Announces Third Quarter 2013 Operating Results and $0.21 AFFO per Share" ("Third Quarter 2013 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The release announced AFFO of $46.7 million, or $0.21 per share, an increase over 42% over the prior quarter.

155.    The Third Quarter 2013 Press Release contained the following comments from Defendant Schorsch regarding the Company's financial results:

***We have continued to build enterprise value during this third quarter, and for now are intently focused on execution*** . . . . In this regard, we have identified several near-term key objectives: completing the announced ARCT IV and Cole transactions; becoming self-managed and significantly broadening our intellectual capital by continuing to attract the best and brightest managers in the industry; deleveraging and terming out our balance sheet utilizing long-term, fixed rate debt; and effectively and seamlessly integrating Cole organization.

*     *     *

We are fully committed to becoming self-managed, as promised . . . . In fact, it is a closing condition for our merger with Cole. We will announce the President of American Realty before year-end. We have already moved to bolster our team with several key hires. Brian Block, our CFO, will now be focused exclusively on American Realty. Lisa Beeson joins us as COO after 25 years as an investment banker with tremendous M&A and capital markets expertise. Lisa Pavelka McAlister is our new CAO with 25 years' experience in senior financial roles versed in all aspects of financial and accounting operations.

*     *     *

156.    Also on November 7, 2013, American Realty also filed with the SEC its Form 10-Q for the quarter ended September 30, 2013 ("Third Quarter 2013 Form 10-Q"), signed by Schorsch and Block, that contained the false and misleading statements described in ¶37.

### c)      **ARCT IV Merger Proxy Materials**

157.    On December 3, 2013, Defendants filed a Registration Statement with the SEC related to the ARCT IV Merger, and disseminated a Joint Proxy Statement/Prospectus ("ARCT IV Registration Statement/Proxy") to shareholders. The ARCT IV Registration Statement/Proxy was reviewed and signed by Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson and Stanley.

158.    Additionally, the ARCT IV Registration Statement/Proxy incorporated by reference the following American Realty financials, many of which have now been restated: 2012 Form 10-K, First Quarter 2013 Form 10-Q, Second Quarter 2013 Form 10-Q and Third Quarter 2013 Form 10-Q. Defendants Schorsch and Block signed each of the incorporated financial statements, which assured investors that:

[W]e, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

159.     The ARCT IV Merger Agreement was attached as Annex A to the ARCT IV Registration Statement/Proxy.  Section 5.7(c) of the ARCT IV Merger Agreement represented that:

a)       American Realty and its subsidiaries "maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP."

b)       the members of the audit committee of American Realty's Board of Directors had been informed of "all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect [American Realty's] ability to record, process, summarize and report financial data."

c)       [American Realty] ha[d] established and maintains disclosure controls and procedures (as such term is defined in Rule 13a-15 promulgated under the Exchange Act) designed to ensure that material information relating to [ARCP] required to be included in reports filed under the Exchange Act, including its consolidated subsidiaries, is made known to [ARCP's] principal executive officer and its principal financial officer by others within those entities, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared, and, to the knowledge of [ARCP], such disclosure controls and procedures are effective in timely alerting [ARCP's] principal executive officer and its principal financial officer to material information required to be included in [ARCP's] periodic reports required under the Exchange Act.

160.     On December 3, 2013, the ARCT IV Registration Statement/Proxy was disseminated to shareholders.  The version sent to shareholders contained American Realty's fiscal year 2012 financial data and financial data for the period ended September 30, 2013, and represented that "[i]n ARCP's opinion, such unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information."  All of these financial statements have been restated.

### d) December 2013 Debt Offerings

161. On December 4, 2013, American Realty announced:

a) The December 2013 Reopening – a reopening of the 2018 Notes (the "December 2013 Reopening"). The December 2013 Reopening was conducted pursuant to the 2013 Shelf Registration Statement, a Pricing Term Sheet and Free Writing Prospectuses dated December 5, 2013, and Prospectus Supplements dated December 5, 6, and 9, 2013; and

b) December 2013 Note Offering - an offering of 3.75% Convertible Senior Notes due December 15, 2020, which were ultimately priced at $402.5 million (the "2020 Notes"). The December 2013 Note Offering was conducted pursuant to the 2013 Shelf Registration Statement, a Pricing Term Sheet dated December 5, 2013, and Prospectus Supplements dated December 5, 6 and 9, 2013.

162. The December 2013 Reopening Materials and the December 2013 Offering Materials incorporated by reference American Realty's 2012 Form 10-K, First Quarter 2013 Form 10-Q, Second Quarter 2013 Form 10-Q, and Third Quarter 2013 Form 10-Q. These materials contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as described above in ¶¶36-37.

### e) Cole Merger Proxy Materials

163. On December 20, 2013, American Realty filed the Cole Registration Statement with the SEC. On December 23, 2013, the Company filed the Cole Merger Proxy with the SEC. A copy of the Cole Merger Agreement was attached to both the Cole Registration Statement and the Cole Merger Proxy and was incorporated by reference in both documents.

164. American Realty's 2012 Form 10-K, First Quarter 2013 Form 10-Q, Second Quarter 2013 Form 10-Q and Third Quarter 2013 Form 10-Q, which were each signed by Defendants Schorsch and Block and incorporated into the Cole Registration Statement and Cole Merger Proxy, also assured investors that:

[W]e, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness

of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

165. The Cole Registration Statement/Merger Proxy, which was disseminated on December 23, 2013 to American Realty and Cole, Inc. shareholders, purported to present accurate financial data for American Realty for the first nine months of 2013, representing that "[i]n [American Realty's] opinion, such unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information." All of these financial statements have been restated.

166. The statements referenced above in ¶¶154-65, were each materially false and misleading and omitted material facts when made. The true facts were that:

(a) As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions; (ii) maintain adequate controls over various grants of equity-based compensation; and (iii) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(b) American Realty's financial statements were materially false and misleading, did not accurately reflect the Company's financial performance, and were not prepared in conformity with GAAP;

(c) American Realty's 2014 AFFO estimates and related statements about its projected earnings growth were not accurate, attainable, honestly believed, or founded on a reasonable basis. As Defendants knew but omitted to disclose to investors, American Realty's

claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(d)     The Company admitted in connection with its Restatement that American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing; and

(e)     American Realty's acquisition strategy was not beneficial for its shareholders, but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction."

### f)     Fourth Quarter And Year-End 2013 Financial Results

167.     On February 27, 2014, American Realty issued a press release announcing "Record Earnings of $163.9 Million and AFFO Per Share of $0.86 for 2013" ("Fourth Quarter 2013 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The release touted, among other things, record earnings and AFFO.  Specifically, American Realty announced AFFO of $55.8 million, a year-over-year increase of 153%, and AFFO per fully diluted share of $0.25, a year-over-year increase of 108%.  For the fiscal year ended 2013, the Company reported AFFO of $163.9 million, an increase of 240% from 2012, and AFFO per fully diluted share of $0.86, an

increase of over 80% from 2012 and "Exceeding Consensus AFFO Estimates." The Company also reported a net loss of $406.5 million, or $2.36 per share.

168. On February 27, 2014, American Realty also filed the 2013 Form 10-K that contained the false and misleading statements described in ¶38. The 2013 Form 10-K was signed by Schorsch, Beeson, Block, Kay and McAlister.

169. After the market closed on February 27, 2014, Defendants held a conference call to discuss the Company's fourth quarter 2013 results. During the conference call, Schorsch confirmed that *"[o]ur earnings guidance is solid,"* and even had *"room for upside[.]"* Defendant Block stated:

> Based on the strength of our acquisitions, success in our private capital management business, strategic execution of our balance sheet initiatives, and the continued savings in G&A costs, *we comfortably affirm our 2014 AFFO guidance of $1.13 to $1.19 per share.*
>
> We currently have today 812.5 million shares and share equivalents outstanding on a fully diluted basis. *The end result of all these numbers I just mentioned is a run rate of around $1.11 to $1.13 per share AFFO.* Again, this number is a run rate through what we know today.
>
> *If we didn't do anything else as of April 1, we would achieve this roughly $1.12 per share for the prospective 12 months. We of course will continue to acquire more than the $1 billion we've discussed over the next nine months, and therefore achieve higher results*.

170. Additionally, the following exchange regarding the transaction took place between analyst Chris Lucas of Capital One Securities and Defendant Block about the Company's full-year 2014 AFFO estimates:

> **Analyst Lucas**: And then, again related to guidance, Brian, just in terms of getting to the low end of the numbers we should just assume that $1.13 at the low end is reflective of just essentially what you talked about before, which is what's done and nothing more? Is that effectively how we should be thinking about the low end?

**Defendant Block**: *That's correct*. To repeat Chris, *if we didn't do anything past March 31, we would be at the low end of the range, notwithstanding the fact that we have a lot more acquisition potential for the duration of the year.*

171. Also during the call, Defendant Beeson commended American Realty's "acquisition machine" in the following exchange with analyst Josh Patinkin of BMO Capital Markets:

> **Analyst Patinkin**: Okay. And is that, you think, what enabled you such an attractive initial yield, going into smaller deal size?
>
> **Beeson**: Absolutely. That is how we distinguish ourselves. *No other company has the acquisition machine that we have built here*, that enables us to cost effectively do smaller one-off transactions, *and that's how we're able to get the pricing differential*.
>
> We can buy three assets at a 7.75% or an 8% cap that another competitor buys in a portfolio at a 6, 7% cap. That's a significant spread differential, and we do that because we're able to, and we'll do granular level acquisitions.

172. The statements referenced above in ¶¶167-71 were each materially false and misleading and omitted material facts when made. The true facts were that:

(a) American Realty's reported AFFO for the fourth quarter of 2013 was overstated by nearly 90%, and its reported AFFO for the full year of 2013 was overstated by 23%, as detailed above in ¶148;

(b) American Realty's financial statements were materially false and misleading as they did not accurately portray the Company's financial performance, and were not prepared in accordance with GAAP. Specifically, American Realty reported that its AFFO for the year ending December 31, 2013, was $163,915,000. Defendants have admitted, however, that the reported AFFO figure was materially inflated, including because American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership. As a result, American Realty was forced to restate and amend its 2013 Form 10-K, including the following adjustments: (i) AFFO and AFFO per share were reduced by $43.9 million (23%) and

$0.20 per share (23%), respectively; and (ii) net loss attributable to stockholders and net loss per share were increased by $16.8 million (3.5%) and $0.08 per share (3.5%), respectively;

(c)     American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis.  As Defendants knew but omitted to disclose to investors, American Realty's claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(d)     As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(e)     As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, (ii) maintain adequate controls over various grants of equity-based compensation; and (iii) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates; and

(f)     American Realty's acquisition strategy was not beneficial for its shareholders, but instead, by design, generated transaction fees for Schorsch-controlled companies

and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.

### g)  First Quarter 2014 Financial Results

173.  On May 8, 2014, American Realty issued a press release announcing "Record First Quarter 2014 Operating Results" ("First Quarter 2014 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The press release announced AFFO available to common stockholders of $147.4 million, or $0.26 per share, representing a year-over-year increase of 334.6%.

174.  The First Quarter 2014 Press Release contained the following statements from Defendant Kay:

> With our acquisitions team firing on all cylinders, ***every aspect of our business is exceeding our expectations . . . .  With strong earnings, our acquisition volume is outpacing our guidance***, our cap rates surpass all industry peers, Cole Capital launched two new products, and we successfully integrated our management and systems, all of which is allowing us to execute with a disciplined intensity.  The $1.7 billion of acquisitions we have closed or placed under contract were at a 7.92% cash cap rate or 8.26% GAAP cap rate. These 150 self-originated transactions are indicative of ***the scale and expertise of our platform, providing a significant competitive advantage.***

175.  Defendant Beeson further noted that the Company's ***"improved operational and financial efficiencies"*** had positioned American Realty ***"well to drive meaningful growth."***

176.  Also on May 8, 2014, American Realty filed with the SEC its Form 10-Q for the quarter ended March 31, 2014 ("First Quarter 2014 Form 10-Q").  The First Quarter 2014 Form 10-Q was signed by Defendants Schorsch and Block, and contained the false and misleading statements described in ¶39.

177.  Later on May 8, 2014, American Realty held a conference call to discuss the Company's first quarter 2014 financial results.  During the call, Defendant Schorsch stated that

investors should buy American Realty stock as ***"we're way undervalued"*** and ***"our stock is cheap."***

178.     During the call, Defendant Beeson discussed aspects of the Company's operations and net lease portfolio, stated that it had "successfully integrated over 300 individuals from the multiple entities into one cohesive enterprise," and confirmed that the respective accounting systems had likewise been "fully integrated as well."

179.     The statements referenced above in ¶¶173-78 were each false and misleading and omitted material facts when made.  The true facts were that:

(a)     American Realty's reported first quarter 2014 AFFO of $147 million, or $0.26 per share, was overstated by 35% and 37%, respectively;

(b)     American Realty was not experiencing "improved operational efficiencies," and was not positioned for meaningful growth, as the Company lacked reliable financial controls and, as a result, was issuing false financial reports, including materially inflated AFFO and unreliable AFFO guidance;

(c)     American Realty's financial statements were materially false and misleading as they did not accurately portray the Company's financial performance, and were not prepared in conformity with GAAP.  Specifically, American Realty reported that its AFFO available to common stockholders was $147.4 million;

(d)     American Realty's 2014 AFFO estimates and related statements about its projected earnings growth were not accurate, attainable, honestly believed, or founded on a reasonable basis;

(e)     As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not

properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(f)     As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions (ii) maintain adequate controls over various grants of equity-based compensation; and (iii) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(g)     American Realty's acquisition strategy was not beneficial for its shareholders, but instead, by design, generated transaction fees for Schorsch-controlled companies and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction;

(h)     Defendants' statement above in ¶178 that the Company had successfully integrated its financial systems and operations "into one cohesive enterprise" was false because the Company lacked even the most basic accounting functions, including a standardized internal accounting close and cash reconciliation process; and

(i)     Defendants' statements above in ¶¶174 and 177, that the Company was generating "strong earnings" and was "way undervalued" were based on inflated AFFO numbers

that were only possible through manipulation and falsification of American Realty's actual performance.

### h) May 2014 Secondary Stock Offering

180. On March 14, 2014, American Realty committed to offer up to 138 million of newly issued shares of common stock at $12.00 per share, which ultimately raised $1.65 billion.

181. The May 2014 Stock Offering was conducted pursuant to the 2013 Shelf Registration Statement, which incorporated by reference American Realty's 2013 Form 10-K and First Quarter 2014 Form 10-Q, as well as a preliminary Prospectus Supplement filed May 21, 2014, and a Prospectus Supplement filed May 23, 2014. Each of these documents represented that: (i) the financial results contained therein were accurate and presented in accordance with GAAP; and (ii) American Realty's internal controls were effective and any material changes to internal controls over financial reporting had been disclosed. The May 2014 Equity Offering Materials were signed by American Realty, Schorsch and Block.

182. The statements referenced above in ¶¶180-81 were each materially false and misleading and omitted material facts when made. The true facts were that:

 (a) American Realty's financial statements referenced above were materially false and misleading as they did not accurately portray the Company's financial performance, and were not prepared in accordance with GAAP. Specifically, the AFFO that American Realty reported in its 2013 Form 10-K and its First Quarter 2014 Form 10-Q were inflated because American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership. As a result, American Realty was forced to restate and amend its 2013 Form 10-K, including the following adjustments: (i) AFFO and AFFO per share were reduced by $43.9 million (23%) and $0.20 per share (23%), respectively; and (ii) net loss attributable to stockholders and net loss per share were increased by $16.8 million

(3.5%) and $0.08 per share (3.5%), respectively. Additionally, American Realty restated and amended its First Quarter 2014 Form 10-Q, including the following adjustments: (i) AFFO and AFFO per share were reduced by $38.5 million (26.1%) and $0.07 per share (26.9%), respectively; and (ii) net loss attributable to the Company and net loss per share were reduced by $17.2 million (5.58%) and $0.03 per share (5.58%), respectively;

(b)     American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis. As Defendants knew but omitted to disclose to investors, American Realty's claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(c)     As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(d)     As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, (ii) maintain adequate controls over various grants of equity-based compensation; and (iii) develop standardized policies and procedures for critical accounting

estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(e)     American Realty's acquisition strategy was not beneficial for its shareholders, but instead, by design, generated transaction fees for Schorsch-controlled companies and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction; and

(f)     The Company lacked appropriate controls to ensure, among other things, that its Code of Conduct was adhered to and that employees would not be subject to pressure to make inappropriate decisions concerning the formulation of American Realty's financial statements or calculation of AFFO.

### i)     Second Quarter 2014 Financial Results

183.     On July 29, 2014, American Realty issued a press release for the second quarter of 2014 ("Second Quarter 2014 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The release announced AFFO of $205.3 million, representing a year-over-year increase of 429.0%, and AFFO per diluted share of $0.24, representing a year-over-year increase of 26%.  The Company also reported a net loss of $63.4 million, or $0.08 per share.

184.     The Second Quarter 2014 Press Release contained the following statement from Defendant Schorsch regarding the Company's financial results:

> . . . I have continued to focus my attention on improving corporate governance. . . . With the support of our Board of Directors, we are improving our practices by eliminating related party transactions, enhancing disclosures, evaluating executive compensation, opting out of the MUTA [Maryland Unsolicited Takeover Act] to assure our stockholders' right to elect the entire Board at each annual meeting, and implementing other policies designed to improve our reporting and transparency, further align interest with our stockholders, and eliminate potential conflicts of interest. Our goal is to constantly improve our corporate governance, which we expect will ultimately be reflected in our corporate

governance scores. All of these efforts are taken with a view toward creating long-term value for stockholders.

185.    Likewise, Defendant Kay stated that American Realty was purportedly well-positioned to continue to provide value to its shareholders:

Our second quarter results and accomplishments are indicative of our focus on driving long-term value by delivering on our commitments. . . . ***we are positioned for long-term success.***

186.    Also on July 29, 2014, American Realty filed with the SEC its Form 10-Q for the quarter ended June 30, 2014 ("Second Quarter 2014 Form 10-Q"). The Second Quarter 2014 Form 10-Q was signed by Defendants Schorsch, Block and McAlister, and contained the false and misleading statements described in ¶39.

187.    Later on July 29, 2014, American Realty held a conference call to discuss the Company's second quarter 2014 financial results. During the call, Defendant Kay stated:

***From afar, it may appear at times our rapid growth is hard to understand. I can assure you, however, that everything we do is directed towards a singular objective: to create value for our shareholders.***

188.    Defendant Block commented on American Realty's second quarter 2014 financial performance and AFFO guidance, stating, in relevant part:

Our second-quarter results are in line with our expectations. . . . AFFO was $198.6 million, or $0.24 per fully diluted share, which represents a 26% increase from this period last year.

*        *        *

Additionally, ***our internal operations continue[] to strengthen. The synergy created by the integration of the Cole team and the adoption of new technology has allowed us to be more timely and efficient in our financial reporting.*** In fact, this enhanced scale allowed us to move up the timing of our 10-Q filing and earnings call as a result of these improvements by roughly a week.

189.    The statements referenced above in ¶¶183-88 were each materially false and misleading and omitted material facts when made. The true facts were that:

(a) American Realty's reported AFFO of $0.24 per share was overstated by more than 14%, and its reported net loss of $40.3 million was understated by more than 26%;

(b) American Realty's financial statements were materially false and misleading as they did not accurately portray the Company's financial performance, and were not prepared in accordance with GAAP. Specifically, as to the second quarter of 2014, American Realty reported that AFFO was $205,278,000 and $353,058,000 for the three and six month periods ended June 30, 2014, respectively. Defendants have since admitted, however, that these figures are inflated because, among other things, American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership. This, in turn, caused American Realty's net loss to be understated for the three and six months ended June 30, 2014. Indeed, American Realty was forced to restate and amend the Second Quarter 2014 Form 10-Q, including the following adjustments: (i) AFFO and AFFO per share were reduced by $19.3 million (9.4%) and $0.03 per share (12.5%), respectively; and (ii) net loss attributable to the Company and net loss per share were increased by $14.4 million (35.7%) and $0.02 per share (35.7%), respectively;

(c) American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis. As Defendants knew but omitted to disclose to investors, American Realty's claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(d) As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the

information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(e)  As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, (ii) maintain adequate controls over various grants of equity-based compensation; and (iii) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(f)  The Company lacked appropriate controls to ensure, among other things, that its Code of Conduct was adhered to and that employees would not be subject to pressure to make inappropriate decisions concerning the formulation of American Realty's financial statements or calculation of AFFO;

(g)  The Company was not improving its governance practices, reporting practices, transparency or practices concerning related party transactions. During the same quarter that Defendants Schorsch, Kay and Block were making these representations, they had deliberately falsified American Realty's reported AFFO by tens of millions of dollars and its AFFO per share by more than 14%;

(h)  American Realty's acquisition strategy was not beneficial for American Realty shareholders, but instead, by design, generated transaction fees for Schorsch-controlled

companies and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction;

(i)     The Company's financial reporting was neither "timely" nor "efficient," but instead was grossly inadequate, replete with inadequacies, and the product of fraudulent accounting artifices; and

(j)     American Realty's results for the second quarter of 2014 did not position the Company for "long-term success," and were not the product of Defendants' focus on driving long-term value for American Realty shareholders, but rather were the result of deliberate, pervasive, and systematic manipulation by Defendants Schorsch, Block, Kay and McAlister of American Realty's financial results, including its AFFO.

## D.     <u>No Safe Harbor</u>

190.     The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

191.     Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of American Realty who knew that the statement was materially false or misleading when made.

### E. Plaintiffs' Exchange Act Claims Are Timely

192. Claims asserted herein under the Exchange Act were first brought in the American Realty consolidated securities class action captioned, *In re American Realty Capital Properties, Inc. Litigation*, No. 15-mc-00040-AKH (S.D.N.Y.) (the "Class Action"), within applicable limitations periods. The filing of the initial class action complaint in the Class Action asserting Exchange Act claims served to toll the statute of limitations for all individual claims of putative class members under the *American Pipe* tolling doctrine. *See American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). Plaintiffs were members of the putative class in such case (and related putative class action cases) until the filing of this action and thus benefit from the *American Pipe* tolling doctrine.

193. Plaintiffs' Exchange Act claims relating to their purchases of American Realty Swaps are also timely, even without *American Pipe* tolling. Plaintiffs did not discover – and a reasonably diligent plaintiff would not have discovered – the facts constituting Defendants' scienter with respect to the alleged misstatements and omissions relevant to the American Realty Swap purchases until December 18, 2014, at the earliest, or March 2, 2015. Plaintiffs timely brought this action within two years of both of those dates and thus satisfied the applicable Exchange Act statute of limitations.

194. Plaintiff Eton Park Overseas Fund acquired all of the American Realty Swaps on February 7, 2014. Plaintiffs' claims relating to the American Realty Swaps are, accordingly, based exclusively on misstatements and omissions that occurred prior to February 7, 2014 – *i.e.*, prior to American Realty's Q1 and Q2 2014 financials. Plaintiffs did not discover – and a reasonably diligent similarly situated plaintiff would not have discovered – the facts constituting Defendants' scienter with respect to the pre-February 2014 misstatements and omissions that form the basis of

Plaintiffs' claims relating to the American Realty Swaps until December 18, 2014, at the earliest, or March 2, 2015.

195.    On December 18, 2014, Defendant McAlister filed a Verified Complaint against American Realty, Schorsch and Kay that first provided facts constituting Defendants' scienter with respect to certain pre-February 2014 alleged misstatements and omissions underlying Plaintiffs' claims relating to the American Realty Swaps.   Specifically, McAlister's Verified Complaint revealed for the first time how she "repeatedly informed Mr. Schorsch, Mr. Kay and senior management [that] she had discovered that the Company had, *in the fourth quarter of 2013 [], and possibly in earlier quarters*, suddenly and without any apparent justification or basis, changed the method by which it had historically reported its adjusted funds from operations." (Emphasis added.)   In addition, the Verified Complaint revealed for the first time that "ARCP continued to use this improper methodology in its 1OQ filings *at the specific direction of Messrs. Schorsch and Kay*."

196.    Defendants publicly denied Defendant McAlister's allegations, and refuted their scienter for pre-February 2014 misstatements and omissions.   For example, in the Class Action, Defendants asserted that the Company's corrective disclosure on October 29, 2014 was limited to "certain errors in Q2 of 2014" and "cannot possibly be said to support a strong inference of scienter for the *prior periods* [in 2013 and 2014] as to which they disclose no intentional misbehavior." ECF No. 99.  (Emphasis added.)

197.    Scienter facts concerning the Company's pre-February 2014 statements and omissions were also revealed on March 3, 2015, when the Company announced the results of the Restatement.   On that date, American Realty first disclosed misstatements and omissions concerning the Company's financial statements for reporting periods prior to 2014.   The Company

also disclosed on March 2, 2015 dozens of new categories of accounting errors and adjustments, and a host of self-dealing transactions by Schorsch and other members of senior American Realty management, that were not previously identified and provide support for the strong inference of scienter alleged herein.

198.    The March 2, 2015 disclosures, together with relevant facts in McAlister's Verified Complaint, provided Plaintiffs with sufficient detail and particularity to survive a Rule 12(b)(6) motion to dismiss, including the heightened pleading requirements for scienter under 15 U.S.C. § 78u–4(b)(2), with respect to the alleged misstatements relevant to the American Realty Swaps. Such detail and particularity were not previously discovered by Plaintiffs and would not have been discovered by a similarly situated reasonably diligent investor.

199.    Plaintiffs' Exchange Act claims are also brought within applicable repose periods, as less than five years have elapsed since the violations upon which such claims are based.  The claims asserted herein under New York common law were brought within the applicable six-year limitations period.

### F.    Plaintiffs' Reliance

200.    During the Relevant Period, Plaintiffs relied on the materially false and misleading statements alleged herein when purchasing American Realty common stock and Swaps.

201.    There is a presumption of reliance established by the fraud-on-the-market doctrine in this case because, among other things:

(a)    The Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b)    The misrepresentations and omissions were material;

(c)    The Company's common stock traded in efficient markets;

(d)     The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiffs purchased American Realty common stock and Swaps between the time Defendants misrepresented or failed to disclose material facts, and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

202.     At all relevant times, the markets for American Realty common stock and Swaps were efficient for the following reasons, among others: (a) American Realty's common stock was listed, and actively traded, on the NASDAQ, a highly efficient and automated market; (b) American Realty filed periodic reports with the SEC; (c) American Realty regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and (d) American Realty was followed by numerous analysts who wrote reports that were published, distributed and entered the public market.  As a result of the foregoing, the market for American Realty's publicly traded common stock promptly digested current information with respect to the Company and reflected such information in the price of American Realty's common stock.  Plaintiffs relied on the price of American Realty's common stock and Swaps, which reflected all the information in the market, including the misstatements by Defendants.

203.     Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are also predicated upon omissions of material fact which there was a duty to disclose.

204.    In addition, Plaintiffs directly relied on Defendants' false and misleading statements alleged herein when deciding whether to purchase or acquire American Realty stock or Swaps. During the Relevant Period, Eton Park, the Plaintiffs' investment adviser, acting through its team of investment professionals, made investments for the portfolios of the Plaintiffs pursuant to an investment management agreement that granted investment discretion to Eton Park. Eton Park employs an active strategy based on an analytical, research-driven investment process. Eton Park researches and analyzes investment opportunities in individual companies, including American Realty, and makes a decision on whether to purchase, sell, or hold shares or equity swaps in those companies. Factors considered by Eton Park included, among other things, the financial performance of the company (including based on publicly available filings made by the company) and a review of the company's strengths, weaknesses and opportunities.

205.    Throughout the Relevant Period, Eton Park undertook comprehensive asset valuation analyses and performed rigorous independent and fundamental research, including reading and relying upon publicly available information concerning American Realty from the following sources: (a) American Realty's public statements, plans and news releases; (b) American Realty's corporate website and materials posted on its website; (c) analyst reports and earnings conference calls involving American Realty; (d) American Realty's periodic securities filings with the SEC and the NASDAQ; (e) other regulatory filings and reports regarding American Realty; and (f) industry conferences and conference transcripts involving American Realty.

206.    In particular, Eton Park investment analysts read and relied on statements from the foregoing sources concerning American Realty's reported AFFO and net loss. Eton Park used the Company's reported AFFO and net loss as metrics to analyze American Realty's current and future operations and financial performance, and in making decisions whether to invest in American

Realty or its competitors. In so doing, the Eton Park investment team also read and relied on statements from these sources attesting to the effectiveness of the Company's internal financial and disclosure controls.

207. Prior to their purchases of American Realty common stock and/or Swaps on February 7, 2014, Plaintiffs, through their investment adviser Eton Park, read and reviewed the Cole Merger Proxy materials, including specifically, the false and misleading statements identified above in ¶¶163-65. In reliance on the false and misleading statements in the Cole Merger Proxy materials, on February 7, 2014, Plaintiffs purchased or acquired 7,464,780 shares of American Realty common stock, in connection with the closing of the Cole Merger, and Swaps representing 13,863,165 shares of American Realty common stock, and were damaged by the fraud detailed herein.

208. Prior to their purchases of American Realty common stock and/or Swaps on May 21, 2014, Plaintiffs, through their investment adviser Eton Park, read and reviewed the Fourth Quarter 2013 Press Release, the 2013 Form 10-K, the First Quarter 2014 Form 10-Q, the First Quarter 2014 Press Release, and the Offering Materials for the May 2014 Stock Offering, including specifically, the false and misleading statements identified above in ¶¶173-78, 180-81. In reliance upon the false and misleading statements in the documents referenced in ¶¶173-78, 180-81, including reported AFFO and net loss, Plaintiffs purchased or acquired 4,000,000 shares of American Realty common stock on May 21, 2014, in connection with the May 2014 Equity Offering, and were damaged by the fraud detailed herein.

209. Defendants' false and misleading statements alleged herein had a material influence and were a substantial factor in bringing about Plaintiffs' portfolio manager's investment decisions with respect to American Realty stock and Swaps. Plaintiffs' portfolio manager did not know, and

in the exercise of reasonable diligence could not have known, of Defendants' false and misleading statements alleged herein when deciding that the Plaintiffs should purchase, sell, or hold American Realty common stock during the Relevant Period.

## G. Loss Causation

210. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the Plaintiffs' economic loss. As Defendants' false and misleading statements and omissions became apparent to the market, beginning on October 29, 2014, the price of American Realty stock declined precipitously as the artificial inflation was removed, causing substantial damage to the Plaintiffs. As of the opening of market trading on October 29, 2014, Plaintiff Eton Park Domestic Fund held 5,912,529 shares of American Realty stock, and Plaintiff Eton Park Overseas Fund held 103,999 shares of American Realty stock and 10,876,412 shares of American Realty Swaps.

211. As detailed above, before the market opened on October 29, 2014, American Realty made a series of startling admissions regarding the effectiveness of its internal controls and the accuracy of its financial information. In direct response to these disclosures, American Realty common stock plummeted, trading as low as $7.85 per share on October 29, 2014, on an extremely heavy volume. Before the market closed on October 29, 2014, American Realty held a conference call for investors and analysts. During the call, Defendant Kay provided further detail about the fraud, but attempted to minimize its effects. Specifically, Defendant Kay characterized it as "a one-quarter adjustment," implied the fraud was known to, and committed by, just two Company executives and stated that "[n]one of the executives that are currently at the Company have been implicated during the investigation related to the concealment of that error." Further, he reassured investors that the Company's "controls and processes [had] continued to improve" in recent months. These assertions were later shown to be false by additional disclosures on October 30, October 31, and November 3, 2014. On October 29, 2014, the price of American Realty common

stock closed at $10.00 per share – a decline of nearly 20% – on heavy trading volume of over 231 million shares traded, which was nearly 30-times greater than the average daily trading volume during the Relevant Period.

212.    On the next three consecutive trading days, the price of American Realty's stock price continued to decline by, respectively, 5.8%, 5.8% and 11.5%.  By November 3, 2014, the Company's stock price closed at $7.85, a 36.6% drop from the pre-disclosure price.   The Company's stock price continued to decline during this period as investors absorbed the information provided and learned additional facts about the Company's fraud and its impacts. These declines in American Realty stock were the direct and proximate result of the nature and extent of Defendants' prior materially false and misleading statements and omissions being revealed to the market.  The timing and magnitude of the price declines negate any inference that Plaintiffs' losses were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct.   The following charts demonstrate the clear divergence of the prices of American Realty equity and debt securities from relevant indexes, as the truth became known to the market:







### H.    Counts

### COUNT IV

**Violation Of Section 10(b) Of The Exchange Act
And SEC Rule 10b-5 Promulgated Thereunder**

**(Against Defendants American Realty, ARC Properties,
Schorsch, Block, Kay, Beeson and McAlister)**

213.    Plaintiffs repeat and reallege each and every allegation in ¶¶1-27 and 63-212 above as if fully set forth herein.

214.    This claim is brought by Plaintiffs against Defendants American Realty, ARC Properties, Schorsch, Block, Kay,[3] Beeson and McAlister for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

215.    As alleged above, during the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

216.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of American Realty common stock and Swaps.

---

[3] Plaintiffs' claim for violation of Section 10(b) is limited with respect to Defendant Kay to the alleged false and misleading statements or omissions Kay made on or after February 27, 2014.

217. Plaintiffs have suffered damages in that, in reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for American Realty common stock and Swaps. Plaintiffs would not have purchased or acquired American Realty common stock and Swaps at the prices they paid, or at all, if they had been aware that those prices had been inflated by Defendants' misleading statements and omissions.

218. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of American Realty common stock and Swaps during the Relevant Period.

## COUNT V

## Violation Of Section 20(a) Of The Exchange Act

### (Against AR Capital)

219. Plaintiffs repeat and reallege each and every allegation in ¶¶1-27 and 63-212 above as if fully set forth herein.

220. Plaintiffs bring this claim against AR Capital for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

221. The entity named in this Count acted as a controlling person of American Realty and ARC Properties within the meaning of Section 20(a) of the Exchange Act. By reason of its ownership interests in American Realty and ARC Properties, the entity named herein had the power and authority to cause these entities to engage in the wrongful conduct alleged herein.

222. American Realty is a subsidiary of AR Capital, which is a subsidiary of RCS Capital, the ultimate parent entity of Defendant Schorsch's empire. American Realty and ARC Properties were also controlled by AR Capital. Additionally, American Realty, which was ARC Properties' sole general partner and owned approximately 96.5% of its equity during the Relevant

Period, controlled ARC Properties. AR Capital and American Realty shared executive officers and Board members during the Relevant Period, including Defendant Schorsch and Kahane.

223. AR Capital possessed the power to control, and did control, directly and/or indirectly, the actions of American Realty during the Relevant Period. American Realty did not have any employees at the time of its IPO in September 2011 and continued to have no employees until sometime in 2014. Instead, American Realty was externally managed by RCS Capital until December 27, 2012 and AR Capital thereafter. AR Capital managed American Realty's activities on a day-to-day basis, provided American Realty with its management team and support personnel, employed American Realty's CEO, President, CIO and other executive officers, and also supplied the compensation for American Realty's executive officers. American Realty consistently stated in SEC filings that it was "completely reliant" on AR Capital, who had "the power to direct the activities of [American Realty] through advisory/management agreements."

224. AR Capital, through this management relationship, controlled the actions of American Realty, thereby reaping over $900 million, with its "affiliates," in fees during the Relevant Period – fees that American Realty has now acknowledged included transactions for which there is no confirming documentation or otherwise warranted scrutiny.

225. According to American Realty, AR Capital had "the power to direct the activities of [American Realty] through advisory/management agreements." The resources of this company were vital to the implementation and execution of American Realty's business and growth strategies, including the acquisition of American Realty's numerous properties. Therefore, AR Capital possessed the power to control, and did control, American Realty.

226. Defendant AR Capital exercised control directly and indirectly over the actions of American Realty in connection with its violations of Section 10(b) of the 1934 Act and SEC Rule

10b-5 promulgated thereunder. By reason of such conduct, Defendant AR Capital is liable pursuant to Section 20(a) of the 1934 Act.

## COUNT VI

### New York Common Law Fraud

**(Against Defendants American Realty, Schorsch,
Block, Kay and McAlister)**

227. Plaintiffs repeat and reallege each and every allegation in ¶¶1-27 and 63-212 above as if fully set forth herein.

228. As alleged above, during the Relevant Period, Defendants American Realty, Schorsch, Block, Kay and McAlister misrepresented facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants made material misrepresentations and omitted to disclose material facts in Forms 10-K for 2012 and 2013, Forms 10-Q and Press Releases for 2Q, 3Q, and 4Q 2013, Forms 10-Q and Press Releases for 1Q and 2Q 2014, the Cole Merger Announcement and Press Release, the ARCT IV Merger Proxy Materials, the Cole Merger Proxy Materials, the February 7, 2014 Press Release, and the Offering Materials for the May 2014 Stock Offering.

229. These misrepresentations and omissions were made intentionally, or at a minimum, recklessly, to induce reliance thereon by Plaintiffs when making decisions to invest in American Realty stock and Swaps.

230. These misrepresentations and omissions constitute fraud and deceit under New York law.

231. Plaintiffs reasonably relied upon the misrepresentations and omissions when making decisions to purchase American Realty's shares and did not know of any of the misrepresentations or omissions at that time.

232.     As a direct and proximate result of the fraud and deceit by Defendants, Plaintiffs suffered damages in connection with their investment in American Realty's common stock and Swaps.

233.     Defendants' wrongful conduct, as described above, was malicious, reckless and willful.  Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.     Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including all interest thereon;

B.     Awarding Plaintiffs punitive damages against Defendants;

C.     Awarding Plaintiffs injunctive and other equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

D.     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Awarding such other relief as this Court may deem just and proper.

## VI. <u>JURY TRIAL DEMAND</u>

Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Dated: February 24, 2017

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP

*/s/ Blair A. Nicholas*
BLAIR A. NICHOLAS
JONATHAN D. USLANER
DAVID R. KAPLAN
JENNY E. BARBOSA
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323
blairn@blbglaw.com
jonathanu@blbglaw.com
davidk@blbglaw.com
jenny.barbosa@blbglaw.com

*/s/ Mark Lebovitch*
MARK LEBOVITCH
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
markl@blbglaw.com

*Counsel for Plaintiffs*